**In the Interest of Cynthia NYFLOT..**

**Fe CABUSO, M.D., State Hospital, Petitioner and Appellee,**

v.

**Cynthia NYFLOT, Respondent and Appellant.**

**Civ. No. 10546.**

Supreme Court of North Dakota.

Nov. 15, 1983.

Mark A. Beauchene (argued), of Kraemer, Beauchene & Associates, Fargo, for respondent and appellant.

Keith Reisenauer, Asst. State's Atty., Fargo, for petitioner and appellee.

GIERKE, Justice.

This is an appeal by the respondent, Cynthia Jewel Nyflot, from an Order for Hospitalization and Treatment Following Treatment Hearing entered in the County Court of Cass County on September 14, 1983. We affirm.

On August 23, 1983, a Petition for Involuntary Treatment was filed with the clerk of county court by the respondent's parents LaVerne and Oscar Nyflot. A preliminary hearing was held on August 25, 1983, at which time the court found probable cause to believe the respondent was a person requiring treatment and ordered her detained for up to fourteen days for examination at the Jamestown State Hospital.

At the State Hospital, the respondent was examined by Dr. Fe E. Cabuso, a staff psychiatrist. Dr. Cabuso concluded that the respondent was mentally ill and that, if she were not hospitalized, there existed a serious risk of harm to herself, others, or property. On September 1, 1983, Dr. Cabuso petitioned the court for an order for involuntary treatment pursuant to § 25–03.1–22 of the North Dakota Century Code. A treatment hearing was subsequently held on September 9, 1983. Following the hearing, the judge issued his findings of fact and conclusions of law and ordered the respondent hospitalized for involuntary treatment for a period not to exceed ninety days. From that order the respondent appeals.

The respondent has presented four issues for our review:

1. Whether the petition for involuntary treatment should be dismissed as a result of petitioner's failure to have respondent examined by an expert examiner;

2. Whether the trial court lost jurisdiction over the person of the respondent by failing to hold the treatment hearing within fourteen days after the preliminary hearing;

3. Whether the examination report of Dr. Cabuso failed to give a clear explanation of how the respondent met the criteria of a person requiring treatment; and

4. Whether the trial court's findings of fact support the conclusion that the respondent is a person requiring treatment who presents serious risk of harm as defined by § 25–03.1–02(11), N.D.C.C.

We will discuss these issues in the order listed above.

I

■ Respondent's first issue is that Dr. Cabuso was not an "expert examiner" as defined by § 25–03.1–02(6), N.D.C.C. That section provides that an "expert examiner" must be "a licensed physician, psychiatrist, or clinical psychologist". It further requires that "an evaluation of a respondent's mental status shall be made only by a licensed psychiatrist or clinical psychologist". It is clear from the record that Dr. Cabuso was not a psychiatrist licensed under the

laws of this State at the time of the initial examination of the respondent on August 25, 1983. She was, however, licensed on August 26, 1983. The majority of the interviews with the respondent were conducted by Dr. Cabuso following licensure. Her conclusions and recommendations were arrived at following licensure.

The respondent also asserts that Dr. Cabuso is not a qualified "expert examiner" because she is not "board certified" as a psychiatrist, nor is she eligible for such certification. Our laws, however, do not require certification. Section 25–03.1–02(6), N.D.C.C., requires only that an "expert examiner" be a licensed psychiatrist. North Dakota has no separate licensing procedure for psychiatrists. The only requirement is that a psychiatrist be a licensed physician. As of August 26, 1983, Dr. Cabuso was a licensed physician specializing in psychiatry, which is all the statutes require. In addition, Dr. Cabuso had completed two years of a psychiatric residency program and had been employed for twelve and a half years as staff psychiatrist in a South Dakota institution. Her lack of certification, therefore, does not disqualify her as an "expert examiner".

## II

The second issue raised by the respondent is whether or not the court lost jurisdiction over this matter by its failure to hold the treatment hearing within fourteen days after the preliminary hearing.

Section 25–03.1–19, N.D.C.C., requires that an "involuntary treatment hearing, unless waived by the respondent or the respondent has been released as a person not requiring treatment, shall be held within fourteen days of the preliminary hearing". It is respondent's contention that this statute is jurisdictional in nature. In support of this position, the respondent cites *State ex rel. Lockman v. Gerhardstein,* 107 Wis.2d 325, 320 N.W.2d 27 (Wis.App.1982). In *Gerhardstein,* the Court of Appeals of Wisconsin held that a Wisconsin statute similar to the one at issue in the instant case was mandatory rather than directory and that

the trial court lost jurisdiction over the respondent because of its failure to hold a final commitment hearing within fourteen days of respondent's detention. *Id.* at 29. A number of other courts have reached a similar conclusion. *E.g., Sisneros v. District Court In And For Tenth Judicial District,* 199 Colo. 179, 606 P.2d 55 (1980); *Matter of Wahlquist,* 585 P.2d 437 (Utah 1978). The principles on which the above-mentioned courts rested their conclusions were set forth in *Matter of Wahlquist, supra* 585 P.2d at 439, as follows:

"However well intended, the confinement of a person in an institution for mental health treatment is just as effective a restraint on personal liberty as confinement in a prison and may, in some instances, be even more trying or burdensome. It is therefore essential that the rights of one so confined be treated with the same degree of respect as are the rights of persons deprived of their liberty upon accusation or conviction of criminal conduct. Consistent with that principle, it is important that there be full compliance with the statutes setting forth the procedures for commencing and continuing such involuntary hospitalization."

Petitioner, on the other hand, argues that the statute in question is more in the nature of a procedural rule—that the involuntary treatment hearing should be subject to continuance for good cause shown.

In resolving the issue thus presented we are called upon to construe § 25–03.1–19, N.D.C.C. In so doing we must construe the statute as a whole with a view toward arriving at the legislative intent. *State v. Kottenbroch,* 319 N.W.2d 465, 472 (N.D.1982). The legislative intent in enacting a statute must first be sought from the language of the statute. *State v. Nordquist,* 309 N.W.2d 109, 116 (N.D.1981). The portion of § 25–03.1–19, N.D.C.C., at issue provides that "The involuntary treatment hearing ... *shall* be held within fourteen days of the preliminary hearing" [emphasis added]. Respondent contends that the clear language of the statute is mandatory and that the county court's failure to

adhere to this mandate resulted in the loss of the county court's power and authority to order her hospitalization. The word "shall", as used in statutes, is ordinarily mandatory but where it is necessary to give effect to intent "shall" will be construed as "may". *State v. McMorrow*, 332 N.W.2d 232, 234 n. 2 (N.D.1983); *Northwestern Bell Telephone Company v. Wentz*, 103 N.W.2d 245, 254 (N.D.1960).

It is clear from an examination of Chapter 25–03.1, N.D.C.C., that the purpose of this legislation is twofold: (1) to ensure that those persons who, because they may be suffering from mental illness, alcoholism, or drug addiction and present a serious risk of harm to themselves, to others, or to property, are provided with care and treatment to remove those dangers; and (2) to ensure that the due process rights of those who are brought into the mental health system against their will are protected. Section 25–03.1–19, N.D.C.C., is clearly a reflection of legislative concern that a person not be detained against his will any longer than is reasonably necessary to accomplish the purpose of the detention. That purpose is to provide for the examination of the respondent by an expert examiner to assist the court in determining whether the respondent is a "person requiring treatment". § 25–03.1–11, N.D.C.C.

In the instant case, Dr. Cabuso's examination, report, and resulting petition were filed with the county court on September 1, 1983,—well within the time set forth in § 25–03.1–19, N.D.C.C. Indeed, the involuntary treatment hearing was originally scheduled for September 6, 1983, also within the time frame set forth by § 25–03.1–19. The record indicates, however, that Dr. Cabuso was ill on September 6 and the hearing was continued to enable her to testify.[1] September 8 marked the end of the fourteen days set forth by § 25–03.1–19, N.D.C.C. The hearing, however, was continued until September 9.

If, as the respondent contends, the fourteen-day limit is jurisdictional in nature, September 8 marked the end of the court's authority to order her detained and the end of the court's power to order her involuntary hospitalization and treatment. This would be so regardless of her mental state and the possible danger presented to herself, to others, or to property. We do not believe that such a construction would effectuate the intent of the Legislature as derived from the entire statute. The statute, read in its entirety, reflects a balance between the due process rights of the respondent and the respondent's possible need for treatment and society's interest in ensuring that that treatment is forthcoming. *See generally In the Interest of Ebertz*, 333 N.W.2d 786 (N.D.1983). We believe that a construction of the word "shall" as directory rather than mandatory most accurately reflects the intent of the Legislature and effectuates the purposes of the legislation.

In *State v. Carlson*, 258 N.W.2d 253 (N.D. 1977), this court was asked to construe § 29–33–03, N.D.C.C., which is part of North Dakota's codification of the Uniform Mandatory Disposition of Detainers Act. Section 29–33–03 provides, in part:

"If, after such a request, the indictment, information, or complaint is not brought to trial within that period [90 days], no court of this State shall any longer have jurisdiction thereof, nor shall the untried indictment, information, or complaint be of any further force or effect, and the court shall dismiss it with prejudice."

The quoted language is much stronger than the language of § 25–03.1–19, N.D.C.C., which is at issue here. This court held, nevertheless, in *Carlson, supra,* that the ninety-day period is a procedural statutory right and may be waived by defense counsel's agreement or oral stipulation. In *Carlson* we stated that the parties, through counsel, may stipulate to extend the time and that as a result the time limits imposed

---

1. The county court order extending the time for hearing recited that the "Petitioner and Respondent's attending psychiatrist at the State Hospital, Fe Cabuso, M.D., was ill and unable to testify on Tuesday, September 6, 1983, the original date set for the hearing. September 9, 1983, is the earliest date on which Dr. Cabuso will be sufficiently recovered to testify."

by statute would not be considered jurisdictional, but procedural. In § 25–03.1–19, N.D.C.C., no reference is made that such a time limit is jurisdictional. It stands to reason, therefore, that upon a showing of good cause the time limit may be extended.

In arriving at this conclusion, we are mindful of the fact that, in cases such as the instant one, an individual is being detained against her will even though she is not alleged to have committed a crime nor has she been adjudged to be a "person requiring treatment". That which might constitute "good cause" for a continuance in an involuntary hospitalization case such as the instant one is not to be equated with that which might pass for "good cause" in the ordinary civil action. The liberty interest of freedom from bodily restraint which is at stake is of the highest order.[2] The courts must bear this in mind when determining whether a delay at any stage of the proceedings which might affect the length of detention is for "good cause".

■ In the instant case, the respondent's treatment hearing was delayed for one day past the statutory limit in order to provide the court with the assistance of an "expert examiner" and to provide the respondent with the opportunity to test the expert's conclusions through cross-examination. When viewed in light of the burdens which would be placed upon the respondent, the court, and the county, were the county court to be reversed and the whole process begun anew, as well as the manifest objectives of Chapter 25–03.1, N.D.C.C., we conclude that the final treatment hearing in the instant case was continued for "good cause".

### III

Respondent's third issue relates to Dr. Cabuso's failure to include in her report to the county court a clear explanation of how she arrived at the conclusion that the respondent was a "person requiring treatment".

---

2. The Legislature might wish to impose sanctions upon those who disregard the 14-day limit

Section 25–03.1–11, N.D.C.C., requires that the expert examiner performing a court-ordered examination file a written examination report with the county court prior to the final treatment hearing. The report is to contain:

1. Evaluations of the respondent's physical condition and mental status.

2. A conclusion as to whether the respondent meets the criteria of a person requiring treatment, with a clear explanation of how that conclusion was derived from the evaluation required.

3. If the report concludes that the respondent meets the criteria of a person requiring treatment, a list of available forms of care and treatment that may serve as alternatives to involuntary hospitalization.

4. The signature of the examiner who prepared the report.

A "person requiring treatment" is defined in § 25–03.1–02(11), N.D.C.C. The portion of that definition relevant to the issue raised here provides as follows:

"11. 'Person requiring treatment' means . . . a person:

"a. . . .

"b. Who is mentally ill, an alcoholic, or drug addict, and there is a reasonable expectation that if the person is not hospitalized there exists a serious risk of harm to himself, others, or property. 'Serious risk of harm' means a substantial likelihood of:

"(1) Suicide as manifested by suicidal threats, attempts, or significant depression relevant to suicidal potential;

"(2) Killing or inflicting serious bodily harm on another person, inflicting significant property damage, as manifested by acts or threats, or

"(3) Substantial deterioration in physical health, or substantial injury, disease, or death resulting from poor self-control or judgment in providing

without "good cause".

one's shelter, nutrition, or personal care."

▰ Dr. Cabuso's report concluded that the respondent was a "person requiring treatment". The report, however, contained no "clear explanation of how that conclusion was derived", as required by § 25–03.1–11(2), N.D.C.C. The report also failed to state in what respect the respondent presented a "serious risk of harm" to herself or the community. The respondent contends that these failures on the part of Dr. Cabuso denied her notice of the particular issues to be determined at the hearing. While we cannot condone the omissions evident in the record, neither can we conclude, on the facts of this particular case, that the respondent was without adequate notice of the issues. The facts on which Dr. Cabuso based her conclusion were clearly stated in the record and were known by the respondent. The determination that the respondent presented "a serious risk of harm" did not, in this case, rest upon psychiatric interpretations of the subtle manifestations of mental disorder. If that were the case we might agree that respondent was not adequately informed. To the contrary, the determination in this case rested on the respondent's willful, overt acts which clearly demonstrated a "serious risk of harm" to the respondent and to the community. The due process requirement of notice was therefore not affected by the omissions in Dr. Cabuso's report.

### IV

▰ The respondent's fourth contention is that the facts do not support the conclusion that the respondent is a person requiring treatment because she did not present a serious risk of harm, as defined by § 25–03.1–02(11), N.D.C.C.

The court found as a fact that:

"... on August 29 and September 2, 1983, the respondent started two separate fires in the women's bathroom at the dormitory and that on one of those occasions a great amount of smoke escaped from the bathroom causing personnel to check into the bathroom where the respondent was found by herself in her pajamas; ..."

Respondent contends that because these fires amounted to little property damage, due to the fact that the bathrooms where the fires were started were virtually inflammable, there was no substantial likelihood that significant property damage or bodily harm could have resulted to the respondent or others as a result of the fires. The statute, however, is not concerned with harm which occurred in the past except as it establishes a potential for serious harm by future behavior of the respondent acting in conformity with previous conduct. The respondent testified that she started the fires to gain attention and to dramatize the fact that she did not want to be in the institution. She also testified that it was not her intent to harm anyone, including herself, and that she felt that there was no likelihood of such harm under the circumstances. Her subjective intentions and assessment of the likelihood of harm, however, do not alter the fact that she was willing to start fires to attract attention to herself. Absent compelling evidence to the contrary, it is a mere fortuity that more damage was not done or that the respondent suffered no ill effects from the smoke produced.

Other undisputed facts further support the conclusion that the respondent presented a serious risk of harm. She rolled lit cigarettes under the door of another patient's room. When the attendants attempted to take her cigarette lighter away from her, she concealed it in her vagina. She cut the screen on a window, using wire cutters which had been smuggled into the institution to her by a friend and, when discovered, she hid the wire cutters in her panties. We believe that these facts clearly support the court's determination that the respondent presented a serious risk of harm to herself, to others, and to property.

For the reasons stated in the opinion, the order of the county court is affirmed.

ERICKSTAD, C.J., and PEDERSON, VANDEWALLE and SAND, JJ., concur.