In the Interest of P.L.P.

WAYNE P., Petitioner and Appellee,

v.

P.L.P., Respondent and Appellant.

Civil No. 960343.

Supreme Court of North Dakota.

Dec. 4, 1996.

Jeanne L. McLean Behrens, State's Attorney, Bottineau, for petitioner and appellee. Submitted on brief.

Cynthia G. Schaar–Mecklenberg (argued), Jamestown, for respondent and appellant.

MESCHKE, Justice.

P.L.P. appealed a 90–day forced-hospitalization order for treatment of her chemical dependency on prescription drugs for pain. We affirm.

P.L.P., separated from her husband pending a divorce, voluntarily entered a hospital to evaluate her medication usage for chronic migraine headaches. While there, her estranged husband filed a verified petition on September 19, 1996, that listed the 18 doctors she had seen and the many medicines she had used since January 17, 1996. Her husband identified these medications "either from pill bottles that I have collected, pharmacy receipts, checks written, or insurance claim vouchers." The petition alleged: "In addition to these medicines, she has been taking medications prescribed for their cat. She has lied to a pediatrician about symptoms for their 7 year old daughter in order to get a Rx for something w/ codeine. She has been going up to Canada now to get medication as she's having difficulty getting an area Dr. to prescribe."

Her husband believed P.L.P. was refusing to follow a doctor's recommendation that she "definitely needs 30 days treatment," "is threatening to discharge herself," and "is

overmedicate[d] and mixing medications to the point it is extremely dangerous to herself." His petition asked the Bottineau County District Court to take P.L.P. "into immediate custody" because "an evaluation of the respondent's condition should be made and involuntary commitment and treatment is required."

From this petition, the Bottineau County District Court found probable cause to believe P.L.P. was "chemically dependent and is imminently likely to injure [her]self ... if allowed to remain at liberty" so that an emergency existed, ordered P.L.P. temporarily detained for up to seven days at the Jamestown State Hospital, and also ordered the necessary treatment hearing be held in Stutsman County District Court where the hospital is located.

The petition, the emergency detention order, and a report of examination of P.L.P. by Addiction Counselor Dave Tompkins in consultation with Dr. Esther Spahr that recommended P.L.P.'s hospitalization and treatment, were filed in Stutsman County District Court on September 24, 1996. The next day, that court appointed counsel for P.L.P., found "good cause was shown for a continuance" because "the Stutsman County District Judge is unable to schedule the treatment hearing on the calendar on or before September 27, 1996," and scheduled the treatment hearing for October 2.

At the hearing, Dr. Spahr testified that P.L.P. had admitted to her that she used more than the prescribed amounts of pain medication. Dr. Spahr also testified that P.L.P. was chemically dependent on pain medications. Dr. Spahr believed that P.L.P.'s continued usage of pain medications would cause her physiological problems within a few years, and that, while inconclusive tests on P.L.P.'s liver made it difficult to say how immediate the danger was, it was possible P.L.P. might already have physical problems. Dr. Spahr anticipated that P.L.P.'s treatment would be the "standard program of 28 days" in the structured environment of the hospital. P.L.P. insisted she did not need treatment, and testified that doctors in her clinic believed one doctor had been giving her improper medication so,

upon request of her doctor, she had entered a hospital only to determine whether she was suffering from withdrawal headaches. However, an addiction-counselor intern testified P.L.P. had admitted to her that her drug usage had become a problem in recent years. An addiction counselor also testified P.L.P. had admitted to her that she used more than prescribed dosages, that she was addicted, and that she "had a problem with her drug usage."

The trial court found P.L.P. was "very resistant to treatment," had "poor insight into medication treatment problems," and "appears dependent upon her prescribed medication and uses a substantial amount of time obtaining such medication through elaborate and extreme schemes." The trial court concluded, "if [she] continues in her present circumstances and usage of medication, she will substantially damage her physical health in time." The court concluded P.L.P. was chemically dependent, was thereby "substantially impair[ed][in] her capacity to use self-control, judgment and discretion in her social affairs" including a "substantial deterioration in physical health," and that alternative treatment was not appropriate "at this time." The court ordered P.L.P. hospitalized for treatment for not over ninety days.

Three weeks later on October 22, 1996, because P.L.P. "no longer require[d] hospitalization," the superintendent of the Hospital released P.L.P. to out-patient treatment at the North Central Human Service Center upon condition that she undergo "aftercare counseling" there, become involved "with NA including sponsorship," and abstain "from misuse of prescription pain medication." On October 24, upon receipt of the Hospital's notice of release and P.L.P.'s waiver of hearing, the Bottineau County District Court ordered P.L.P. to undergo outpatient treatment on those conditions for the remainder of the ninety days.

■ On November 1, 1996, P.L.P. filed an expedited appeal, urging that the Stutsman County trial court's scheduling difficulty was not good cause for delaying the required hearing for forced treatment, and that the evidence was not clear and convincing that she required involuntary treatment for chem-

ical dependency. The Hospital recognizes that, when a person said to be suffering from chemical dependency has been detained by an emergency commitment, NDCC 25–03.1–26(2) requires a treatment hearing to "be held no later than seven days after detention" unless, among several reasons, the court extends the time for the hearing upon good cause shown.

The trial court's schedule was "a legitimate factor for ... good cause to continue an involuntary treatment hearing," the Hospital urges, citing *In Interest of Nyflot,* 340 N.W.2d 178 (N.D.1983) and *In Interest of Ebertz,* 333 N.W.2d 786 (N.D.1983), because "[t]he purpose of the statute is for the benefit of the [patient] and the determination as to the [patient's] need for treatment." Even if there was "insufficient cause" here, the Hospital argues, the delay was not serious enough to abandon the treatment ordered after a completed hearing. The Hospital urges that there was clear and convincing evidence for the findings and conclusions that P.L.P. was chemically dependent and needed treatment.

In *Ebertz,* the patient sought dismissal of a petition for involuntary hospitalization, after his suicide attempt, because a petition for a hearing had not been filed, as NDCC 25–03.1–26(1) requires, within twenty-four hours after the emergency commitment. The trial court refused a dismissal because the patient had voluntarily submitted to treatment two days after the emergency detention. *Ebertz,* 333 N.W.2d at 787. After a hearing, the trial court found Ebertz needed outpatient treatment for up to ninety days. Ebertz appealed, and this court affirmed, differentiating between criminal procedures and involuntary treatment procedures that are "more for the benefit of the [patient] than for anyone else." *Ebertz,* 333 N.W.2d at 789. This court reasoned:

> We are ultimately concerned that the respondent was afforded due process at the hearing regarding the determination of whether or not the respondent should be involuntarily committed or given alternative treatment. If due process was afforded, the decision will stand. If due process was not afforded, then a new hearing must be had unless the evidence established that respondent is not in need of treatment or involuntary commitment.

*Id.* (footnote omitted). Even if the statutory deadline was not met, this court concluded that the relevant "scope of inquiry is limited solely to whether or not the [patient] is a person requiring treatment." *Id.*

In *Nyflot,* the patient's treatment hearing was not held, as required by NDCC 25–03.1–19, within fourteen days after the preliminary detention hearing but was held one day late. The trial court decided Nyflot needed treatment for ninety days for mental illness, and he appealed, contending the trial court "lost jurisdiction." *Nyflot,* 340 N.W.2d at 180. Because the statute did not declare "such a time limit is jurisdictional," this court ruled it "stands to reason, therefore, that upon a showing of good cause the time limit may be extended." *Id.* at 183. Because the "liberty interest of freedom from bodily restraint which is at stake is of the highest order," however, this court reasoned that what "might constitute 'good cause' for a continuance in an involuntary hospitalization case [like this] one is not to be equated with that which might pass for 'good cause' in the ordinary civil action." *Id.*

> When viewed in light of the burdens which would be placed upon the [patient], the court, and the county, were the ... court to be reversed and the whole process begun anew, as well as the manifest objectives of [the chapter on Commitment Procedures for Mental and Physical Illness or Disability], we conclude that the final treatment hearing in [this] case was continued for 'good cause.'

*Nyflot,* 340 N.W.2d at 183. For similar reasons, we conclude this five-day continuance of the treatment hearing was not jurisdictional. *Compare In Interest of N.W.,* 531 N.W.2d 303, 307 (N.D.1995) (when hearing to extend foster care not held timely, dismissal serves no practical purpose except to delay stability in lives of children); *Anderson v. H.M.,* 317 N.W.2d 394, 402 (N.D.1982) (similar). The trial court's scheduling problems were good cause in this case, and reversal of this treatment order is not justified by the delay.

■ We believe, though, the trial judge's personal schedule cannot be the sole factor in postponing a liberty hearing. Ordinarily, the trial court should state on the record what efforts have been made to seek another trial judge for a timely hearing. Still, in these days of increasingly crowded calendars and decreasing judicial resources, scheduling difficulties may well justify briefly postponing even a liberty hearing. While this record does not show efforts to obtain an alternate judge, we nevertheless conclude this meager record shows some good cause for the delay.

In this case, counsel was appointed for P.L.P. on September 25, 1996, and made no effort before the hearing began to expedite the hearing or to obtain the release of P.L.P. under NDCC 25–03.1–40(11) (right to habeas corpus when detained illegally). This five-day extension, while troublesome in length, does not call for retroactively throwing out the treatment hearing.

■ P.L.P. complains that her estranged husband was not available for cross-examination about his sworn petition for her involuntary emergency commitment. In her testimony, the testifying physician relied extensively on the information in that sworn petition, over P.L.P.'s standing hearsay objection. Here, though, P.L.P. mainly argues the petitioner's absence casts enough doubt on the credibility of the verified petition that this record, as a whole, does not have clear and convincing evidence that she poses a serious risk of harm to herself if not treated. We disagree.

Certainly, P.L.P. would have been entitled to cross-examine her estranged husband about his sworn petition if she had subpoenaed him. N.D.R.Civ.P. 43(b) (part): "A party may interrogate any unwilling or hostile witness by leading questions." Since P.L.P. claims she relied on the Hospital's representation that her husband would be there, she probably could have got a continuance to compel his appearance when he did not show up, but she chose not to do so. See Gorley v. Parizek, 475 N.W.2d 558, 561 (N.D. 1991) (party cannot complain on appeal about other party's failure to appear and testify when not subpoenaed). But P.L.P. did not object to completion of the hearing without the presence of her petitioning husband, nor did she seek a delay of the hearing to force his presence.

A medical expert must often rely on second-hand information unless it is demonstrably unreliable. See N.D.R.Ev. 703; see also Advisory Committee Notes to Fed.R.Evid. 703:

Thus a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and X rays. Most of them are admissible in evidence, but only with the expenditure of substantial time in producing and examining various authenticating witnesses. The physician makes life-and-death decisions in reliance upon them. His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes.

In this case, the absence of the petitioner from the hearing does not, by itself, destroy the effect of all the other evidence that P.L.P. was addicted and needed treatment.

Dr. Esther Spahr testified this was P.L.P.'s second admission to the Hospital, having been discharged on November 9, 1995. The evidence shows P.L.P. has been abusing prescription drugs for anxiety and pain, using multiple narcotics obtained from many sources. According to Dr. Spahr, P.L.P. denies her problem and is very manipulative in trying to avoid treatment. In contrast to P.L.P.'s denials, the testimonies of the addiction counselor and the intern about P.L.P.'s direct admissions of her problems reinforce Dr. Spahr's opinions and support the findings that P.L.P. has been seriously addicted.

■ In an involuntary treatment case, we review a trial court's findings under a more probing clearly-erroneous standard. In Interest of R.A.J., 554 N.W.2d 809 (N.D.1996). The trial court found P.L.P. took more medication than was prescribed for her, resisted treatment with poor insight, and was chemically dependent. Because the evidence showed her abuse of medications will sub-

stantially damage her health if continued, the trial court concluded she needed treatment and alternative treatment was not then appropriate. We believe that clear and convincing evidence supported the findings and conclusions that P.L.P. required treatment for chemical dependency.

We affirm the treatment order.

VANDE WALLE, C.J., and MARING, NEUMANN, and SANDSTROM, JJ., concur.