1999 ND 160

**In the Interest of M.D.**

**Brian D. Grosinger, Petitioner and Appellee,**

v.

**M.D., Respondent and Appellant.**

**No. 980250.**

Supreme Court of North Dakota.

Aug. 3, 1999.

Brian D. Grosinger, Assistant State's Attorney, Mandan, ND, for petitioner and appellee.

Wayne D. Goter, Bismarck, ND, for respondent and appellant.

MARING, Justice.

[¶ 1] M.D. appeals from an order committing him as a sexually dangerous individual under N.D.C.C. ch. 25–03.3. We affirm.

I

[¶ 2] In 1993, M.D. pleaded guilty to gross sexual imposition for engaging in sexual acts with a 14–year–old boy. M.D. was sentenced to serve ten years in prison, with five-and-one-half years suspended. M.D. was also ordered to participate in the sex offender treatment program while incarcerated at the state penitentiary. M.D. twice began the treatment program but did not complete it.

[¶ 3] M.D. was released from the penitentiary in 1996 and placed on supervised probation. The conditions of his probation required him to participate in and complete a sex offender treatment program, to have no contact with children under the age of 18 without adult supervision, prohibited him from purchasing or possessing any pornographic materials, and subjected him to search by his probation officer at any time.

[¶ 4] On December 10, 1997, M.D.'s probation officer made an unannounced visit to M.D.'s Mandan apartment. M.D. and two boys, ages 15 and 16, were present in the apartment. While the probation officer was there, two other teen-aged boys came to the apartment.

[¶ 5] The probation officer searched the apartment and found evidence indicating M.D. had written numerous checks to the adult bookstore in Mandan. The officer also found a list of male names. Although this list was designated "coworkers" at the top, subsequent investigation revealed only one was an adult, and the rest were juveniles as young as 13. The officer also found a piece of paper containing the name and telephone number of M.D.'s juvenile

victim from his 1993 conviction. The terms of M.D.'s probation prohibited any contact with the victim. The search also uncovered drug paraphernalia, which also violated the terms of probation.

[¶ 6] Based upon the results of the search, the Morton County Assistant States Attorney filed a petition under N.D.C.C. ch. 25–03.3 for involuntary commitment of M.D. as a sexually dangerous individual. At the preliminary hearing, the district court found there was probable cause to believe M.D. was a sexually dangerous individual and ordered that he be transported to the State Hospital for evaluation under N.D.C.C. § 25–03.3–12. M.D. subsequently requested and received an independent evaluation.

[¶ 7] At the commitment hearing, the petitioner presented evidence of M.D.'s prior conviction, his two failed attempts at sex offender treatment while in prison, and his failure to complete sex offender treatment after his release. The petitioner also presented evidence of the result of the search of M.D.'s apartment.

[¶ 8] A clerk from the adult bookstore testified M.D. was a regular customer, and usually rented gay male videos. M.D. had also purchased gay male magazines, condoms, and a pair of handcuffs in the store. The clerk also testified that on one occasion in December of 1997 M.D. entered the bookstore with several "young kids," who the clerk believed to be 16 or 17 years old. When the clerk asked for identification, they claimed they had none and left the store.

[¶ 9] A clinical psychologist and a psychiatrist who had evaluated M.D. at the State Hospital each testified that M.D. suffered from paraphilia, with fixation on adolescent males. They also diagnosed a personality disorder, with antisocial, borderline, and passive-aggressive features. Both testified it was likely M.D. would engage in sexually predatory conduct in the future.

[¶ 10] The district court found M.D. was a sexually dangerous individual who was likely to re-offend. The court committed M.D. to the care, custody, and control of the Executive Director of the Department of Human Services for appropriate treatment under N.D.C.C. § 25–03.3–13. M.D. has appealed.

II

■ [¶ 11] M.D. argues the district court erred in denying his motion to dismiss the petition for undue delay in the proceedings. Section 25–03.3–13, N.D.C.C., provides in part:

Within thirty days after the finding of probable cause, the court shall conduct a commitment proceeding' to determine whether the respondent is a sexually dangerous individual. The court may extend the time for good cause.

[¶ 12] The finding of probable cause occurred at the preliminary hearing on December 22, 1997. On January 23, 1998, 32 days after the preliminary hearing, the petitioner filed a request for a 30–day extension of time because the evaluating psychiatric expert from the State Hospital had informed the petitioner the 30 days had not been sufficient to evaluate M.D. and because the Assistant States Attorney handling the file had been ill and out of the office for two weeks. The district court granted a 30–day extension on February 2, 1998. The evaluation was completed and, on February 20, 1998, the court ordered M.D. returned to the Morton County Jail where he was to be held under bond on a pending criminal case.

[¶ 13] On February 24, 1998, a telephonic conference was held, during which the parties stipulated M.D. could remain at the State Hospital until a hearing was held on the petition. M.D. also moved for an independent evaluation under N.D.C.C. § 25–03.3–12. On March 2, 1998, the court ordered that M.D. remain at the State Hospital and granted M.D.'s motion for an independent evaluation. The court further ordered M.D. was to make the report of the independent evaluation available to the petitioner at least five days before the commitment hearing if M.D. intended to offer the report or related evidence at the

hearing. The order provided the independent evaluation was to be completed within 30 days, unless further extended by the court.

[¶ 14] The record does not disclose when the independent evaluation was completed, but on May 27, 1998, a notice of trial setting the commitment hearing for July 1, 1998, was sent to the parties. On the day of the commitment hearing, M.D. moved to dismiss because of the delay in the proceedings beyond 30 days. The court denied the motion, noting that "any delay was necessary or contributed to by [M.D.]."

[¶ 15] Section 25–03.3–13, N.D.C.C., gives the court discretion to extend the time for the hearing "for good cause." In the closely related context of civil commitment of persons who are mentally ill or chemically dependent, the statutory framework also allows the court to extend the time for the hearing "for good cause ." N.D.C.C. § 25–03.1–19. In interpreting that statutory procedure, this Court has upheld extensions of the time for hearing because of scheduling problems in the district court's calendar or illness of an expert witness who had evaluated the committed person. *See In re P.L.P.*, 556 N.W.2d 657, 659–60 (N.D.1996); *In re Nyflot*, 340 N.W.2d 178, 181–83 (N.D.1983). In this case, the original extension was requested by the petitioner because the doctor had not been able to complete his evaluation and the attorney handling the case had been ill and out of the office for two weeks. Under the circumstances of this case, we conclude there was good cause for the first 30–day extension granted by the district court.

[¶ 16] M.D. also suggests the original extension was improper because the petitioner's motion was made after the 30–day period required in N.D.C.C. § 25–03.3–13 had expired. The statute does not require that the motion to extend be made within the original 30–day period. In a related context, this Court noted in *Nyflot*, 340 N.W.2d at 182:

If, as the respondent contends, the fourteen-day limit is jurisdictional in nature, September 8 marked the end of the court's authority to order her detained and the end of the court's power to order her involuntary hospitalization and treatment. This would be so regardless of her mental state and the possible danger presented to herself, to others, or to property. We do not believe that such a construction would effectuate the intent of the Legislature as derived from the entire statute. The statute, read in its entirety, reflects a balance between the due process rights of the respondent and the respondent's possible need for treatment and society's interest in ensuring that that treatment is forthcoming.

Similarly, we conclude the petitioner's failure to move for an extension until after the original 30–day period had expired did not deprive the court of authority to consider whether there was good cause to extend the time for the hearing.

[¶ 17] The evaluation was completed and the case was ready to proceed to a hearing within the first extension when M.D. requested an independent evaluation and concomitant extension of time. The court granted M.D.'s request. M.D. cannot now complain about the delay occasioned by his own request for an independent evaluation.

[¶ 18] We are, however, concerned about the length of the delay in this case—more than six months between the December 22 preliminary hearing and the July 1 commitment hearing. We urge the trial courts to set the hearing date as soon as possible, and to be mindful of the liberty interest of freedom from bodily restraint when determining whether a delay is for "good cause" in this type of case. We agree with the district court that the bulk of the delay in this case was attributable to M.D. and under these circumstances, we conclude the court did not err in denying M.D.'s motion to dismiss the proceedings.

### III

■ [¶ 19] M.D. asserts the district court erred in denying his motion to dismiss for improper public disclosure of the proceedings.

[¶ 20] Following the preliminary hearing, several newspapers carried stories detailing the hearing and identifying M.D. At the commitment hearing M.D. moved for dismissal, asserting the proceedings were confidential and had improperly been disclosed.

[¶ 21] Chapter 25–03.3, N.D.C.C., does not explicitly require that proceedings thereunder are confidential, but N.D.C.C. § 25–03.3–11, governing the preliminary hearing, provides that "[e]very individual not necessary must be excluded, except that the court may admit any individual having a legitimate interest in the proceeding." A nearly identical provision requires exclusion of persons without a legitimate interest from the commitment hearing. *See* N.D.C.C. § 25–03.3–13.

[¶ 22] M.D. asserts these statutory provisions demonstrate the legislature's intent to make all proceedings under N.D.C.C. ch. 25–03.3 confidential, and warrants dismissal of the petition when public disclosure is made. The petitioner argues that N.D.C.C. ch. 25–03.3 does not explicitly provide the proceedings and records are confidential, as do the civil mental health commitment provisions, *see* N.D.C.C. § 25–03.1–43, and that, even if the proceedings are confidential, dismissal of the petition is not the appropriate remedy.

■ [¶ 23] We find it unnecessary to determine whether all proceedings and records under N.D.C.C. ch. 25–03.3 are confidential because we conclude, even if they are, dismissal of the petition is not the required remedy. Absent some clear legislative indication that dismissal is required for violation of the confidentiality provisions, we will not read such a remedy into the statute. Additionally, M.D. has failed to offer any evidence that the petitioner or the court was responsible for disclosure of this information to the media, and has failed to demonstrate how his case was prejudiced by the public disclosure. We conclude the court did not err in denying M.D.'s motion to dismiss for public disclosure of the proceedings.

### IV

■ [¶ 24] M.D. challenges the constitutionality of N.D.C.C. ch. 25–03.3, asserting that, because he has already been convicted and punished for the 1993 offense and is subject to pending punishment for violating probation for his actions in 1997, subjecting him to commitment as a sexually dangerous individual would twice put him in jeopardy for the same conduct in violation of state and federal constitutional provisions.

■ [¶ 25] All regularly enacted statutes carry a strong presumption of constitutionality. *Allied Mutual Insurance Co. v. Director of the North Dakota Department of Transportation*, 1999 ND 2, ¶ 7, 589 N.W.2d 201; *Baldock v. North Dakota Workers Compensation Bureau*, 554 N.W.2d 441, 444 (N.D.1996). The presumption is conclusive unless the party challenging the statute clearly demonstrates that it contravenes the state or federal constitution. *Traynor v. Leclerc*, 1997 ND 47, ¶ 8, 561 N.W.2d 644; *Baldock*, at 444.

■ [¶ 26] The Double Jeopardy Clause prohibits only multiple *criminal* sanctions for the same offense:

We have long recognized that the Double Jeopardy Clause does not prohibit the imposition of all additional sanctions that could, " 'in common parlance,' " be described as punishment. *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 549, 63 S.Ct. 379, 87 L.Ed. 443 (1943) (quoting *Moore v. Illinois*, 55 U.S.(14 How.) 13, 19, 14 L.Ed. 306 (1852)). The Clause protects only against the imposition of multiple *criminal* punishments for the same offense ... and then only when such occurs in successive proceedings....

Whether a particular punishment is criminal or civil is, at least initially, a matter of statutory construction. A court must first ask whether the legislature, "in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other." [*United States v.*] *Ward,* 448 U.S. [242,] 248, 100 S.Ct. 2636 [1980]. Even in those cases where the legislature "has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect," *id.,* at 248–249, 100 S.Ct. 2636 as to "transfor[m] what was clearly intended as a civil remedy into a criminal penalty," *Rex Trailer Co. v. United States,* 350 U.S. 148, 154, 76 S.Ct. 219, 100 L.Ed. 149 (1956).

*Hudson v. United States,* 522 U.S. 93, 98–99, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) (citation omitted). In upholding Kansas's Sexually Violent Predator Act, which is similar to N.D.C.C. ch. 25–03.3, the United States Supreme Court explained:

The categorization of a particular proceeding as civil or criminal "is first of all a question of statutory construction." *Allen* [*v. Illinois*], 478 U.S. [364,] 368, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986). We must initially ascertain whether the legislature meant the statute to establish "civil" proceedings. If so, we ordinarily defer to the legislature's stated intent. Here, Kansas' objective to create a civil proceeding is evidenced by its placement of the Act within the Kansas probate code, Kan.Stat.Ann., Art. 29 (1994) ("Care and Treatment for Mentally Ill Persons"), instead of the criminal code, as well as its description of the Act as creating a *"civil commitment procedure,"* § 59–29a01 (emphasis added). Nothing on the face of the statute suggests that the legislature sought to create anything other than a civil commitment scheme designed to protect the public from harm.

Although we recognize that a "civil label is not always dispositive," *Allen, supra,* at 369, 106 S.Ct. 2988 we will reject the legislature's manifest intent only where a party challenging the statute provides "the clearest proof" that "the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention" to deem it "civil," *United States v. Ward,* 448 U.S. 242, 248–249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980). In those limited circumstances, we will consider the statute to have established criminal proceedings for constitutional purposes.

*Kansas v. Hendricks,* 521 U.S. 346, 361, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997).

[¶ 27] The legislature has clearly expressed its intent to create a civil, rather than criminal, procedure in N.D.C.C. ch. 25–03.3. The sexually dangerous individual commitment provisions have been placed in Title 25 of the Century Code, entitled "Mental and Physical Illness or Disability." The provisions are close in proximity and content to the provisions for civil commitment of the mentally ill or chemically dependent, contained in N.D.C.C. ch. 25–03.1. Thus, the legislature has demonstrated its "manifest intent" to create a civil proceeding, and N.D.C.C. ch. 25–03.3 will be found to violate double jeopardy only if M.D. provides the "clearest proof" that the statutory scheme is "so punitive either in purpose or effect as to negate" the legislative intent to deem it civil. *Hendricks,* 521 U.S. at 361, 117 S.Ct. 2072.

[¶ 28] M.D. asserts N.D.C.C. ch. 25–03.3 is clearly punitive in nature because (1) it allows confinement for an indefinite period of time, (2) the executive director has "total and absolute" discretion to determine whether a committed individual still poses a danger to the public, (3) the burden is placed upon the committed person to justify his release, and (4) the statute fails to set forth what quantum of evidence is required to justify confinement or release. M.D.'s argument is based upon a wholesale misinterpretation of N.D.C.C. ch. 25–03.3. Although the statute does not specify time limits on the duration of confinement, it requires annual mental examinations and

reviews by the court, with all of the protections afforded in the original commitment proceedings. N.D.C.C. § 25–03.3–17. The committed individual has a right to petition the court for discharge, with a right to a hearing if there has not been one in the past year. N.D.C.C. § 25–03.3–18. The executive director does not have absolute discretion over continued commitment; only the court may order discharge of a sexually dangerous individual. N.D.C.C. § 25–03.3–17(5). At any hearing on discharge, "the burden of proof is on the state to show by clear and convincing evidence that the committed individual remains a sexually dangerous individual." N.D.C.C. § 25–03.3–18(4).

[¶ 29] The United States Supreme Court addressed similar arguments in *Hendricks*, 521 U.S. at 363–64, 117 S.Ct. 2072 (citations omitted):

> Hendricks focuses on his confinement's potentially indefinite duration as evidence of the State's punitive intent. That focus, however, is misplaced. Far from any punitive objective, the confinement's duration is instead linked to the stated purposes of the commitment, namely, to hold the person until his mental abnormality no longer causes him to be a threat to others. Cf. *Jones* [*v. United States*], 463 U.S. [354,] 368, 103 S.Ct. 3043 [1983] (noting with approval that "because it is impossible to predict how long it will take for any given individual to recover [from insanity]—or indeed whether he will ever recover—Congress has chosen ... to leave the length of commitment indeterminate, subject to periodic review of the patients's [sic] suitability for release"). If, at any time, the confined person is adjudged "safe to be at large,"he is statutorily entitled to immediate release. Kan.Stat.Ann. § 59–29a07 (1994).
>
> Furthermore, commitment under the Act is only *potentially* indefinite. The maximum amount of time an individual can be incapacitated pursuant to a single judicial proceeding is one year. If Kansas seeks to continue the detention beyond that year, a court must once again

determine beyond a reasonable doubt that the detainee satisfies the same standards as required for the initial confinement. This requirement again demonstrates that Kansas does not intend an individual committed pursuant to the Act to remain confined any longer than he suffers from a mental abnormality rendering him unable to control his dangerousness.

Our statute similarly requires annual examinations of the detained person's mental condition, annual notice that the individual has a right to petition for discharge and allows continued confinement only if there is clear and convincing evidence the person is still a sexually dangerous individual. N.D.C.C. §§ 25–03.3–17(2), 25–03.3–18(1), (4).

[¶ 30] M.D. has failed to cite a single case holding a statute providing for commitment of sexually dangerous individuals violates double jeopardy. Numerous courts have, however, held similar statutes do not violate double jeopardy. *See People v. Hedge*, 65 Cal.Rptr.2d 693, 706, 56 Cal.App.4th 773 (1997), *review granted*, 945 P.2d 780 (1997); *In re Linehan*, 594 N.W.2d 867, 873 (1999) (affirming earlier holding in *In re Linehan*, 557 N.W.2d 171 (Minn.1996)); *In re Young*, 122 Wash.2d 1, 857 P.2d 989, 996–1000 (1993).

[¶ 31] M.D. has failed to meet his burden of demonstrating by "clearest proof" that the statutory scheme is so punitive in purpose or effect as to transform the intended civil remedy into a criminal punishment. We conclude N.D.C.C. ch. 25–03.3 creates a civil procedure and does not violate double jeopardy.

## V

[¶ 32] M.D. asserts the evidence was insufficient to support the court's findings and order of committal.

## A

[¶ 33] We have not previously articulated the appropriate appellate standard of review when factual findings are challenged in an appeal from a commitment order

under N.D.C.C. ch. 25–03.3. Under N.D.C.C. § 25–03.3–19, an appeal from an order committing a sexually dangerous individual is "limited to a review of the procedures, findings, and conclusions of the committing court." This standard is identical to the review of civil commitment of the mentally ill and chemically dependent. *See* N.D.C.C. § 25–03.1–29. Both procedures also require proof in the lower court by clear and convincing evidence. *See* N.D.C.C. §§ 25–03.1–19 and 25–03.3–13.

▮ [¶ 34] We have adopted a modified "clearly erroneous" standard of review for factual findings in civil commitment appeals under N.D.C.C. ch. 25–03.1:

> To balance the competing interests of protecting a mentally ill person and of preserving that person's liberty, our standards of decision require trial courts to use a clear and convincing standard of proof while we use a more probing "clearly erroneous" standard of review. As we explained in *In Interest of R.N.*, 513 N.W.2d 370, 371 (N.D.1994), "we will affirm an order for involuntary treatment unless it is induced by an erroneous view of the law or if we are firmly convinced it is not supported by clear and convincing evidence."·

*In re J.S.*, 530 N.W.2d 331, 333 (N.D.1995) (citation omitted); *see also In re R.M.*, 555 N.W.2d 798, 799 (N.D.1996); *In re K.J.L.*, 541 N.W.2d 698, 700 (N.D.1996). Because of the marked similarities between the procedures, purposes, and burdens of proof under N.D.C.C. chs. 25–03.1 and 25–03.3, we adopt this appellate standard of review in appeals from commitments of sexually dangerous individuals under N.D.C.C. ch. 25–03.3, and we will affirm the court's findings of fact unless they are induced by an erroneous view of the law or we are firmly convinced they are not supported by clear and convincing evidence.

B

▮ [¶ 35] Under N.D.C.C. § 25–03.3–13, "the burden is on the state to show by clear and convincing evidence that the respondent is a sexually dangerous individual." Section 25–03.3–01(7) provides:

"Sexually dangerous individual" means an individual who is shown to have engaged in sexually predatory conduct and who has a congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction that makes that individual likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others. It is a rebuttable presumption that sexually predatory conduct creates a danger to the physical or mental health or safety of the victim of the conduct. The term does not include an individual with mental retardation.

In addition, N.D.C.C. § 25–03.3–13 provides, in part:

An individual may not be committed unless evidence is admitted establishing that at least two experts have concluded the individual has a congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction that makes that individual likely to engage in further acts of sexually predatory conduct.

[¶ 36] There is no dispute that M.D.'s conduct leading to his 1993 conviction was sexually predatory conduct under N.D.C.C. § 25–03.3–01(8). M.D. argues, however, that there was insufficient evidence that he was likely to engage in such conduct in the future.

[¶ 37] The record includes ample evidence supporting a conclusion M.D. suffers from a sexual, mental, or personality disorder which makes it likely he will engage in further sexually predatory conduct. M.D. has three times failed to complete a sexual offender treatment program. Details were presented about his 1993 conviction, demonstrating he would groom his young victims through a pattern of coercion and manipulation. The evidence from the search of M.D.'s apartment showed he was befriending young boys in violation of the terms of his probation, and that he main-

tained a list of names of teen-aged boys, as well as the name and telephone number of a prior victim. M.D. patronized the adult bookstore accompanied by teen-aged boys, and procured gay male materials, condoms, and handcuffs. M.D. also admitted to his probation officer he would sometimes procure alcohol for these teen-aged boys. All of this evidence supports an inference M.D. was again engaging in "grooming" conduct, and clearly demonstrates he was not deterred from such conduct by the threat of revocation of his probation.

[¶ 38] The State also presented testimony from two doctors, a clinical psychologist and a psychiatrist, who had evaluated M.D. Both testified M.D. suffered from paraphilia, with a fixation on adolescent males. Both also testified M.D. suffered from a personality disorder, with antisocial, borderline, and passive-aggressive features. Both gave opinions that M.D. was likely to commit sexually predatory conduct in the future, and that he was a sexually dangerous individual under the statute.

[¶ 39] Having reviewed the record, we are not "firmly convinced [that the findings are] not supported by clear and convincing evidence." *See In re J.S.*, 530 N.W.2d 331, 333 (quoting *In re R.N.*, 513 N.W.2d 370, 371 (N.D.1994)). We therefore conclude the findings are not clearly erroneous.

### VI

[¶ 40] We have considered the other issues and arguments raised by M.D. and find them to be without merit. The order committing M.D. as a sexually dangerous individual is affirmed.

[¶ 41] VANDE WALLE, C.J., NEUMANN, KAPSNER and BRUCE BOHLMAN, D.J., concur.

[¶ 42] BRUCE E. BOHLMAN, D.J., sitting in place of SANDSTROM, J., disqualified.