711 N.W.2d 587 (2006)
2006 ND 56
In the Matter of G.R.H.
John P. Van Grinsven, III, Ward County State's Attorney, Petitioner and Appellee
v.
G.R.H., Respondent and Appellant.
No. 20040287.
Supreme Court of North Dakota.
March 29, 2006.
*589 John P. Van Grinsven III, State's Attorney, Minot, N.D., for petitioner and appellee.
Eric Paul Baumann, Minot, N.D., for respondent and appellant.
Jean R. Mullen, Office of Attorney General, Bismarck, N.D., for amicus curiae.
SANDSTROM, Justice.
[¶ 1] G.R.H. appeals from an order involuntarily committing him to the care and custody of the executive director of the Department of Human Services as a sexually dangerous individual. He argues the evidence was insufficient to support the order, his commitment as a sexually dangerous individual violates the due process and double jeopardy provisions of the state and the federal constitutions, and the denial of a judicial determination of his least restrictive treatment also violates due process and double jeopardy. We affirm.

I
[¶ 2] In 1994, G.R.H., then 19 years old, was convicted in Ward County of gross sexual imposition for sexual acts with a victim less than fifteen years old and sentenced to ten years in the North Dakota State Penitentiary, with six years suspended. In 1997, G.R.H. was released from custody and placed on probation. In 1998, the court revoked G.R.H.'s probation for the gross sexual imposition conviction and ordered him incarcerated for 90 days, with the balance of his sentence suspended. Within 20 days after G.R.H. was released from custody in January 1999, he was charged in Burleigh County with corruption or solicitation of a minor for engaging in a sexual act with a minor who was older than 15 when he was at least 22; with delivery of alcohol to a minor; and with failure to register as a sexual offender. G.R.H. pled guilty to those charges, and the district court revoked his probation for the 1994 conviction for gross sexual imposition.
[¶ 3] Before G.R.H.'s release from custody in 2004, the Ward County State's Attorney petitioned to commit him as a sexually dangerous individual under N.D.C.C. ch. 25-03.3. The district court found probable cause to believe G.R.H. was a sexually dangerous individual and transferred him to the North Dakota State Hospital for further evaluation. See N.D.C.C. § 25-03.3-11. G.R.H. was evaluated by two psychologists at the State Hospital, and he also received an independent evaluation by a third psychologist. See N.D.C.C. § 25-03.3-12. After a subsequent commitment hearing under N.D.C.C. § 25-03.3-13, the district court decided G.R.H. was a sexually dangerous individual under N.D.C.C. § 25-03.3-01(8), finding he "has engaged in sexually predatory conduct and has a congenital or acquired condition that is manifested by an anti-social personality disorder that makes *590 [him] likely to engage in further acts of sexually predatory conduct which constitutes a danger to the physical or mental health or safety of others." The court committed G.R.H. to the care, custody, and control of the executive director of the Department of Human Services. See N.D.C.C. § 25-03.3-13.
[¶ 4] G.R.H. appealed, and while his appeal was pending, we granted his motion for a remand to the district court for a supplemental hearing. At the supplemental hearing, G.R.H. argued committing him as a sexually dangerous individual was unconstitutional, given his diagnosis of anti-social personality disorder and his ability to control his behavior. He also argued he was unconstitutionally denied a judicial determination of his least restrictive treatment. After an evidentiary hearing, the district court confirmed its prior commitment order. The court construed N.D.C.C. § 25-03.3-01(8) to mean an individual subject to commitment as a sexually dangerous individual must have serious difficulty controlling his or her behavior. The court found G.R.H. suffers from a serious lack of ability to control his behavior, and confirmed its prior decision that he was a sexually dangerous individual. The court also construed N.D.C.C. § 25-03.3-13 to require the executive director of the Department of Human Services, and not the court, to decide the least restrictive form of treatment for a sexually dangerous individual.
[¶ 5] The district court had jurisdiction under N.D. Const. art. VI, § 8 and N.D.C.C. § 25-03.3-02. G.R.H.'s appeal is timely under N.D.C.C. § 25-03.3-19. This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 25-03.3-19.

II
[¶ 6] Chapter 25-03.3, N.D.C.C., authorizes the involuntary civil commitment of a sexually dangerous individual, which is defined in N.D.C.C. § 25-03.3-01(8) to mean:
[A]n individual who is shown to have engaged in sexually predatory conduct and who has a congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction that makes that individual likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others.
That definition requires three elements before a person may be involuntarily committed as a sexually dangerous individual: (1) the individual has engaged in sexually predatory conduct; (2) the individual has a congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction; and (3) the disorder makes the individual likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others. "Sexually predatory conduct" includes engaging in a sexual act or sexual contact with a victim less than fifteen years old, or with a minor victim when the actor is an adult. N.D.C.C. § 25-03.3-01(9)(a)(4) and (7).

III
[¶ 7] G.R.H. does not dispute that an anti-social personality disorder is a personality disorder under the definition of a sexually dangerous individual in N.D.C.C. § 25-03.3-01(8). He argues, however, there is insufficient evidence he suffers from an anti-social personality disorder, because all three psychologists testified that a diagnosis of an anti-social personality disorder requires personality traits to be inflexible and all three psychologists *591 acknowledged his behavior had improved in recent years. He claims his behavior at the State Hospital has been exemplary, and he has exhibited none of the patterns of behavior which form the basis for a diagnosis of anti-social personality disorder while he has been at the State Hospital. He also claims a diagnosis of anti-social personality disorder requires a pervasive pattern of disregard for rights to begin in childhood or early adolescence, and the only evidence that his behavior began in his childhood or early adolescence was that he ran away from home and had problems with his mother. He claims there is insufficient evidence he suffers from a personality disorder as required by N.D.C.C. § 25-03.3-01(8).
[¶ 8] We apply "a modified clearly erroneous" standard of review to commitments of sexually dangerous individuals under N.D.C.C. ch. 25-03.3. In the Interest of D.V.A., 2004 ND 57, ¶ 7, 676 N.W.2d 776; In the Interest of M.B.K., 2002 ND 25, ¶ 9, 639 N.W.2d 473; In the Interest of M.D., 1999 ND 160, ¶ 34, 598 N.W.2d 799. We will affirm a district court's commitment order unless the order is induced by an erroneous view of the law, or we are firmly convinced the order is not supported by clear and convincing evidence. D.V.A., at ¶ 7; M.B.K., at ¶ 9; M.D., at ¶ 34.
[¶ 9] At both evidentiary hearings, all three psychologists testified they diagnosed G.R.H. with an anti-social personality disorder. G.R.H.'s claim that his behavior had improved while in a controlled environment at the State Hospital does not preclude a finding of an anti-social personality disorder. His "improvement" may be laudable and eventually may lead to a determination that he is not a sexually dangerous individual, but the issue for the district court and this Court is whether this record adequately supports the diagnosis of an anti-social personality disorder. Under our modified clearly erroneous standard of review, we conclude the district court's finding is supported by clear and convincing evidence and is not clearly erroneous.

IV
[¶ 10] G.R.H. nevertheless argues that, given his diagnosis of anti-social personality disorder and his ability to control his behavior, his commitment as a sexually dangerous individual violates the due process and double jeopardy provisions of the state and federal constitutions. G.R.H. argues his commitment violates due process and double jeopardy under Kansas v. Hendricks, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) and Kansas v. Crane, 534 U.S. 407, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002), because his only potential disorder is an anti-social personality disorder and there was no evidence he cannot control his behavior. Relying on Crane, he claims his diagnosis of an anti-social personality disorder is not distinguishable from the rudimentary form of that disorder found in the dangerous but typical recidivist convicted in an ordinary criminal case. He claims the evidence about his disorder does not establish a special and serious lack of ability to control his behavior under Crane.
[¶ 11] In Hendricks, the United States Supreme Court considered a substantive due process challenge to the provisions of Kansas' Sexually Violent Predator Act, which authorized involuntary civil commitment of persons who, due to a mental abnormality or a personality disorder, were likely to engage in predatory acts of sexual violence. 521 U.S. at 350, 117 S.Ct. 2072. The Court held the Act's definition of "mental abnormality" satisfied substantive due process. Id. at 356, 117 S.Ct. 2072. The Court said states may provide *592 for involuntary civil commitment of people who are unable to control their behavior and pose a danger to public health and safety, provided the confinement takes place under proper procedures and evidentiary standards. Id. at 357, 117 S.Ct. 2072. The Court said the Kansas statute satisfied those standards, because it required evidence of past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future if the person is not confined. Id. The Court explained the Kansas statute required a finding of future dangerousness linked to the existence of a "mental abnormality" or "personality disorder" that made it difficult, if not impossible, for the person to control his or her dangerous behavior, which narrowed the class of persons eligible for confinement to those who are unable to control their dangerousness. Id. at 358, 117 S.Ct. 2072. The Court further explained the nomenclature used as the standard for civil commitment was not controlling; rather, the common thread was the individual's inability to control his or her dangerousness. Id. at 359-60, 117 S.Ct. 2072. The Court said an individual's lack of volitional control, coupled with a prediction of future dangerousness, distinguished that individual from other dangerous persons more properly dealt with exclusively through criminal proceedings. Id. at 360, 117 S.Ct. 2072.
[¶ 12] In Crane, the United States Supreme Court again considered a substantive due process challenge to the Kansas law in the context of the Kansas Supreme Court's determination that Hendricks required the State to prove the committed individual was completely unable to control his behavior. Crane, 534 U.S. at 409-15, 122 S.Ct. 867. The Court held that Hendricks did not require a total or complete lack of control. Crane, at 411, 122 S.Ct. 867. The Court said most severely ill people retain some ability to control their behavior and the insistence upon absolute lack of control would risk barring the civil commitment of highly dangerous persons suffering severe mental abnormalities. Id. at 412, 122 S.Ct. 867. The Court said, however, the Constitution does not permit commitment as a dangerous sexual offender without any lack-of-control determination and recognized the constitutional significance of distinguishing a dangerous sexual offender subject to civil commitment from other dangerous persons who are more properly dealt with exclusively through criminal proceedings. Id. The Court explained that distinction was necessary to prevent civil commitment from becoming a mechanism for retribution or general deterrence, which are functions of criminal law and not civil commitment. Id. The Court held lack of control for civil commitment purposes meant there must be proof of serious difficulty in controlling behavior, which must be sufficient to distinguish the dangerous sexual offender, whose serious mental illness, abnormality, or disorder subjects him to civil commitment, from the dangerous but typical recidivist convicted in the ordinary criminal case. Id. In reaching that conclusion, the Court again emphasized that states have considerable leeway to define mental abnormalities and personality disorders that make an individual eligible for involuntary civil commitment. Id.
[¶ 13] Crane and Hendricks reject the idea that due process requires a total or complete lack of control for involuntary civil commitment of a sexually dangerous individual; rather, they require "proof of serious difficulty in controlling behavior." Crane, 534 U.S. at 413, 122 S.Ct. 867. See Hendricks, 521 U.S. at 358, 117 S.Ct. 2072. Other courts have applied Crane and construed laws for involuntary civil commitment of sexually dangerous individuals to require a nexus between a disorder and *593 future dangerousness, which, in turn, provides proof that the individual has serious difficulty controlling his or her behavior. See In re Matter of Leon, 204 Ariz. 15, 59 P.3d 779, 787 (2002); People v. Williams, 31 Cal.4th 757, 3 Cal.Rptr.3d 684, 74 P.3d 779, 790-92 (2003), cert. denied, 540 U.S. 1189, 124 S.Ct. 1431, 158 L.Ed.2d 98 (2004); In re Detention of Varner, 207 Ill.2d 425, 279 Ill.Dec. 506, 800 N.E.2d 794, 798-99 (2003), cert. denied, 540 U.S. 1225, 124 S.Ct. 1519, 158 L.Ed.2d 164 (2004); State v. Gibson, 187 Or.App. 207, 66 P.3d 560, 566-67 (2003); In re Commitment of W.Z., 173 N.J. 109, 801 A.2d 205, 216 (2002); In re Treatment and Care of Luckabaugh, 568 S.E.2d 338, 349 (S.C.2002); In re Commitment of Almaguer, 117 S.W.3d 500, 505-06 (Tex.App.2003); Shivaee v. Virginia, 270 Va. 112, 613 S.E.2d 570, 576, cert. denied, ___ U.S. ___, 126 S.Ct. 626, 163 L.Ed.2d 509 (2005); In re Detention of Thorell, 149 Wash.2d 724, 72 P.3d 708, 715-16 (2003), cert. denied, 541 U.S. 990, 124 S.Ct. 2015, 158 L.Ed.2d 496 (2004); In re Commitment of Laxton, 2002 WI 82, ¶¶ 21-22, 254 Wis.2d 185, 647 N.W.2d 784.
[¶ 14] In Laxton, 2002 WI 82, ¶¶ 21-22, 254 Wis.2d 185, 647 N.W.2d 784, the Wisconsin Supreme Court offered a typical explanation of that nexus:
[T]he required proof of lack of control, therefore, may be established by evidence of the individual's mental disorder and requisite level of dangerousness, which together distinguish a dangerous sexual offender who has serious difficulty controlling his or her behavior from a dangerous but typical recidivist.
Wisconsin [Stat.] ch. 980 [(1997-98)] satisfies this due process requirement because the statute requires a nexus between the mental disorder and the individual's dangerousness. Proof of this nexus necessarily and implicitly involves proof that the person's mental disorder involves serious difficulty for the person to control his or her behavior. The definition of a sexually violent person requires, in part, that the individual is "dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." Wis. Stat. § 980.01(7) (emphasis added). As we recognized in [State v.] Post, [197 Wis.2d 279, 541 N.W.2d 115 (Wis.1995),] these statutory requirements do not sweep too broadly. The nexus  linking a mental disorder with dangerousness by requiring that the mental disorder predispose the individual to engage in acts of sexual violence  narrowly tailors the scope of ch. 980 to those most dangerous sexual offenders whose mental condition predisposes them to re-offend.
[¶ 15] The interpretation of N.D.C.C. ch. 25-03.3 is a question of law, which is fully reviewable on appeal. See Ash v. Traynor, 2000 ND 75, ¶ 4, 609 N.W.2d 96. The primary purpose of statutory construction is to ascertain the legislature's intent. Douville v. Pembina County Water Res. Dist., 2000 ND 124, ¶ 9, 612 N.W.2d 270. In ascertaining legislative intent, we look first to the words used in the statute, giving them their plain, ordinary, and commonly understood meaning. Id. If the plain language of a statute is clear and unambiguous, the letter of the statute cannot be disregarded under the pretext of pursuing its spirit because legislative intent is presumed clear from the face of the statute. County of Stutsman v. State Historical Soc'y, 371 N.W.2d 321, 325 (N.D.1985). If the language of a statute is ambiguous, however, a court may resort to extrinsic aids, including legislative history, to interpret the statute. Id. We construe statutes to avoid constitutional infirmities. Kjolsrud v. *594 MKB Mgmt. Corp., 2003 ND 144, ¶ 7, 669 N.W.2d 82.
[¶ 16] North Dakota law defines a "sexually dangerous individual" as an individual who has engaged in sexually predatory conduct and has a congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction that makes the individual likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others. N.D.C.C. § 25-03.3-01(8). Under that definition, the requisite disorder or dysfunction must make the individual likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others. We have said "likely to engage in further acts of sexually predatory conduct" means the individual's propensity towards sexual violence is of such a degree as to pose a threat to others. M.B.K., 2002 ND 25, ¶ 18, 639 N.W.2d 473. The plain language in our statute thus requires a causal relationship or nexus between an individual's disorder and dangerousness which establishes a likelihood of re-offending.
[¶ 17] Chapter 25-03.3, N.D.C.C., was enacted in 1997. See 1997 N.D. Sess. Laws ch. 243. The legislative history for the definition of sexually dangerous individual also confirms that the language of our statute requires a causal relationship or nexus between an individual's disorder and dangerousness, because the individual "must be diagnosed with a mental disorder which can be tied by expert testimony to the individual's inability to control his or her behavior and which would, therefore, likely result in further sexually predatory conduct." See Hearing on H.B. 1047 Before the House Judiciary Comm., 55th N.D. Legis. Sess. (Jan. 14, 1997) (section-by-section analysis prepared by Office of Attorney General); Hearing on H.B. 1097 Before the Senate Judiciary Comm., 55th N.D. Legis. Sess. (March 5, 1997) (section-by-section analysis prepared by Office of Attorney General). As originally introduced, the definition of sexually dangerous individual required the individual to have a "mental disorder," which was based on the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed-Rev.) (1994), and which was separately defined in the statute to mean "a congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction." Hearing on H.B. 1047 Before the House Judiciary Comm., 55th N.D. Legis. Sess. (Jan. 14, 1997) (section-by-section prepared by Office of Attorney General). The legislative history for that provision indicates that the definition of mental disorder referenced disorders manifested by a lack of self-control. Id. During the legislative process, the definition of a sexually dangerous individual was amended to its current form in response to a concern that the original definition of "mental disorder" was circular because it included the term "mental disorder." Hearing on H.B. 1047 Before the Senate Judiciary Comm., 55th N.D. Legis. Sess. (March 5, 1997) (section-by-section prepared by Office of Attorney General). The legislative history, however, indicates that amendment continued the intent that the "individual must be diagnosed with a mental disorder which can be tied by expert testimony to the individual's inability to control his or her behavior and which would, therefore, likely result in further sexually predatory conduct." Id.
[¶ 18] Consistent with the language in our statute and to avoid any possible constitutional infirmity, we construe the definition of a sexually dangerous individual to mean that proof of a nexus between the *595 requisite disorder and dangerousness encompasses proof that the disorder involves serious difficulty in controlling behavior and suffices to distinguish a dangerous sexual offender whose disorder subjects him to civil commitment from the dangerous but typical recidivist in the ordinary criminal case. We conclude that nexus between the requisite disorder and future dangerousness satisfies the due process requirements of Crane.
[¶ 19] At the supplemental evidentiary hearing on remand, the State's two expert psychologists testified G.R.H. suffers from a serious lack of ability to control his behavior. The district court found clear and convincing evidence that G.R.H. has a serious lack of ability to control his behavior. Under our modified clearly erroneous standard of review, we conclude the district court's finding is supported by clear and convincing evidence and is not clearly erroneous. We therefore reject G.R.H.'s claim that his commitment as a sexually dangerous individual violates due process under Crane.

V
[¶ 20] G.R.H. argues his commitment violates double jeopardy. In Interest of M.D., this Court held N.D.C.C. ch. 25-03.3 creates a civil procedure for involuntary commitment of sexually dangerous individuals and does not violate double jeopardy. 1999 ND 160, ¶¶ 24-31, 598 N.W.2d 799. See also Hendricks, 521 U.S. at 360-70, 117 S.Ct. 2072 (holding Kansas statute was not criminal proceeding and did not violate double jeopardy). Our interpretation of N.D.C.C. ch. 25-03.3 is consistent with Crane and Hendricks, and our decision in M.D. is dispositive of G.R.H.'s double jeopardy argument.

VI
[¶ 21] G.R.H. argues the denial of a judicial determination of alternatives for his least restrictive treatment violates due process and double jeopardy. Under N.D.C.C. § 25-03.3-13, if the district court finds an individual to be a sexually dangerous individual, the court shall commit the individual to the care, custody, and control of the executive director of the Department of Human Services, and "the executive director shall place the [individual] in an appropriate facility or program at which treatment is available. The appropriate treatment facility or program must be the least restrictive available treatment facility or program necessary to achieve the purposes" of N.D.C.C. ch. 25-03.3.
[¶ 22] The plain language of N.D.C.C. § 25-03.3-13 authorizes the court to commit a sexually dangerous individual to the care, custody, and control of the executive director of the Department of Human Services and authorizes the executive director to place a sexually dangerous individual in an appropriate facility or program for treatment, which must be the least restrictive available treatment facility or program necessary to achieve the purposes of N.D.C.C. ch. 25-03.3. Those statutory provisions require the executive director, not the court, to make that decision. We conclude the district court correctly interpreted the plain language of N.D.C.C. § 25-03.3-13 to authorize the executive director to decide the least restrictive available treatment for a sexually dangerous individual.
[¶ 23] G.R.H. claims if a court is prohibited from determining the least restrictive treatment for a sexually dangerous individual, N.D.C.C. ch. 25-03.3 is unconstitutional because it does not provide for judicial review of the least restrictive alternative determination in violation of the due process and double jeopardy clauses of the state and federal constitutions. He claims the law violates double jeopardy because *596 the failure to provide due process safeguards negates the civil nature of the law.
[¶ 24] Due process "requires that the conditions and duration of confinement... bear some reasonable relation to the purpose for which persons are committed." Seling v. Young, 531 U.S. 250, 265, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001) (citing Foucha v. Louisiana, 504 U.S. 71, 79, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) and Youngberg v. Romeo, 457 U.S. 307, 324, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)). Chapter 25-03.3, N.D.C.C., requires sexually dangerous individuals to be treated in the least restrictive manner necessary to treat the individual and to protect society, and the issue in this case is whether a determination of that issue by the executive director satisfies procedural due process. Procedural due process requires fundamental fairness, which, at a minimum, necessitates notice and a meaningful opportunity for a hearing appropriate to the nature of the case. Gray v. North Dakota Game & Fish Dep't, 2005 ND 204, ¶ 28, 706 N.W.2d 614.
[¶ 25] Under N.D.C.C. ch. 25-03.3, a person alleged to be a sexually dangerous individual is entitled to a panoply of pre-commitment and post-commitment procedures that are sufficient to provide the individual with due process. A person committed as a sexually dangerous individual is entitled to certain post-commitment procedures in N.D.C.C. §§ 25-03.3-17 and 25-03.3-18, including the least restrictive treatment and an annual examination and report to the committing court. At the time of the annual examination, the committed individual has the right to have an expert examine the individual, and, if the individual is indigent, the court shall appoint a qualified expert to examine the committed individual and report to the court. N.D.C.C. § 25-03.3-17(2). The court may order further examination and investigation of the committed individual and the court may set a further hearing at which the committed individual is entitled to be present and to have the benefit of the protections afforded at the original commitment proceeding. N.D.C.C. § 25-03.3-17(4). See M.D., 1999 ND 160, ¶ 28, 598 N.W.2d 799. The executive director may petition a committing court at any time for the discharge of the committed individual. N.D.C.C. § 25-03.3-17(5). The executive director annually shall provide the committed individual with written notice that the individual has a right to petition the court for discharge. N.D.C.C. § 25-03.3-18(1). If a committed individual files a petition for discharge and has not had a hearing under N.D.C.C. §§ 25-03.3-17 and 25-03.3-18 during the preceding year, the committed individual has a right to a hearing on the petition for discharge, at which the committed individual is entitled to be present and to have the benefit of the protections afforded at the original commitment proceeding. A committed individual has a right to appeal from an order of commitment or any order denying a petition for discharge. N.D.C.C. § 25-03.3-19.
[¶ 26] Section 25-03.3-24, N.D.C.C., deals with post-commitment community placement and was enacted in 2005. See 2005 N.D. Sess. Laws ch. 250. Under N.D.C.C. § 25-03.3-24, following commitment of a sexually dangerous individual, the executive director may conduct a risk management assessment of the individual for the purpose of determining whether the individual may be treated safely in the community on an outpatient basis. The executive director may place a committed individual in the community for treatment on an outpatient basis only by court order, and the executive director may petition the court at any time for community placement. Id. A court order for community *597 placement is subject to enumerated restrictions and requirements. Id. The effect of the provisions for post-commitment community placement is that a court order for commitment as a sexually dangerous individual precludes outpatient treatment unless the court enters a subsequent order for outpatient treatment. See id.
[¶ 27] This record reflects that treatment as a sexually dangerous individual may take from seven to ten years, and an individual committed as a sexually dangerous individual is entitled to several post-commitment protections, including an annual review of the commitment and potential placement in outpatient treatment by court order. We conclude the procedures in N.D.C.C. ch. 25-03.3, which provide a person civilly committed as a sexually dangerous individual with pre-commitment and post-commitment safeguards designed to protect the person's liberty interest as the person proceeds through the treatment process, satisfy procedural due process. We further conclude the provision authorizing the executive director to determine the least restrictive treatment does not negate the civil nature of the law and does not violate the double jeopardy provisions of the state and federal constitutions. M.D., 1999 ND 160, ¶¶ 24-31, 598 N.W.2d 799. We therefore hold the provision authorizing the executive director to determine the least restrictive treatment for a sexually dangerous individual does not violate due process or double jeopardy.

VII
[¶ 28] We affirm the commitment order.
[¶ 29] DALE V. SANDSTROM, DANIEL J. CROTHERS, and MARY MUEHLEN MARING, JJ., concur.
KAPSNER, Justice, dissenting.
[¶ 30] To deprive a person of his liberty for an indefinite period of time in the civil commitment of a sexually dangerous individual, the State must show by clear and convincing evidence that the individual to be committed has a disorder that makes the individual likely to engage in further acts of sexually predatory conduct and, because of the disorder, is likely to engage in those acts. N.D.C.C. § 25-03.3-01(8).
[T]here must be proof of serious difficulty in controlling behavior. And this, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case.
Kansas v. Crane, 534 U.S. 407, 413, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002).
[¶ 31] The State failed to meet its burden in this case. Because I am firmly convinced the court's decision is not supported by clear and convincing evidence, I would reverse. I, therefore, respectfully dissent.

I
[¶ 32] G.R.H. has spent much of the last ten years of his young life in prison for committing two sex crimes. A review of G.R.H.'s sex crimes shows that he is not the sort of sexually dangerous individual the civil commitment statute was designed for. Neither sex crime he committed had an element of force as part of the statutory definition of the crime. Neither of his crimes had elements for which one would ordinarily use the adjective "predatory." The crimes involved no stalking of victims, no grooming of victims, no evidence of *598 preplanning, no kidnapping or isolating of victims, and while each of his criminal acts involved a minor victim, G.R.H.'s age in relation to the victims age has to be considered when assessing the likelihood that he represents a threat to children. G.R.H. has never been diagnosed with any sort of sexual disorder such as pedophilia.
[¶ 33] His first sex violation involved voluntary sex between individuals that were five years apart in age. In 1994, when G.R.H. was 19 years old he had voluntary sex with a 14-year-old. He met the girl at a club for persons 18 and older. The girl was in the club despite the age restrictions. The victim's statement indicates the sex was voluntary although at 14 she was statutorily incapable of giving consent. G.R.H. pled guilty to the North Dakota equivalent to statutory rape and was sentenced to ten years in the North Dakota State Penitentiary with six years suspended. In 1997, G.R.H. was released from prison and placed on probation. Shortly after his release, his probation was revoked for failing to register as a sex offender and he was again incarcerated.
[¶ 34] In 1999, now 24 years old, G.R.H. was again convicted of committing a sex crime for engaging in oral sex with a 16-year-old. G.R.H. pled guilty to the charge of corruption or solicitation of a minor for engaging in a sexual act with a minor who was older than 15 when he was at least 22. Because G.R.H. pled guilty, there is no evidentiary record. There are conflicting reports on how this incident developed. Some reports suggest force was involved. Other reports state the girl was drunk at a party and was sexually involved with several men that night.
[¶ 35] Dr. Rosalie Etherington's report stated:
[G.R.H.] had attempted sexual contact with D.D. earlier in the evening but she clearly declined. He then approached her again and after leading her into the downstairs bathroom he asked her to perform fellacio [sic] on him. D.D. indicated that she did not want to but he was very persistent. She then began but stopped and informed him she would not do it any longer. [G.R.H.] then grabbed her head and put his penis inside her mouth and forced her head back and forth upon his penis.
[¶ 36] G.R.H. committed crimes and he should be, and was, punished for his crimes. He has served his sentences for those crimes. While in prison, he received numerous hours of treatment and completed two separate sex offender treatment programs. Now, after spending nearly a decade in prison, G.R.H. is sentenced to an indefinite term of commitment based upon his two violations involving sex with minors.

II
[¶ 37] Chapter 25-03.3, N.D.C.C., authorizes the involuntary civil commitment of sexually dangerous individuals. The statute requires two findings: (1) sexually predatory conduct; and (2) some type of personality, sexual, or mental disorder that makes an individual "likely to engage in further acts of sexually predatory conduct." N.D.C.C. § 25-03.3-01(8). The burden is on the State to show by clear and convincing evidence the defendant is a sexually dangerous individual. Interest of L.D.M., 2005 ND 177, ¶ 5, 704 N.W.2d 838.
[¶ 38] The first element, sexually predatory conduct, is not difficult to find under the statute as currently written. Many high school and college age individuals meet the definition of "sexual predator." "Sexually predatory conduct" does not require a criminal conviction. N.D.C.C. § 25-03.3-01(9). An individual is a sexual predator under the statute for "[e]ngaging or attempting to engage" in voluntary sex *599 with anyone under fifteen years old, regardless of the predator's age.[1] N.D.C.C. § 25-03.3-01(9)(a)(4). An individual is a sexual predator under the statute for "[e]ngaging or attempting to engage" in voluntary sex with a minor when the actor is an adult. N.D.C.C. § 25-03.3-01(9)(a)(7). Thus, a sixteen-year-old sophomore in high school would be a sexual predator for having voluntary sex with a fourteen-year-old freshman, and an eighteen-year-old high school senior would be a sexual predator for having voluntary sex with his seventeen-year-old classmate. For purposes of this statute, oral sex is sex. See N.D.C.C. § 25-03.3-01(6) (defining "sexual act"). An individual can be a sexual predator for "[e]ngaging in or attempting to engage in sexual contact" that an individual "knows or should have known" is "offensive to the victim." N.D.C.C. § 25-03.3-01(9)(b)(1). The astonishing breadth of "sexually predatory conduct" is one reason that civil commitment of a criminal like G.R.H. could occur.
[¶ 39] Besides a showing of "sexually predatory conduct," the State has the burden to show by clear and convincing evidence that an individual has a "congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction that makes that individual likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others." N.D.C.C. § 25-03.3-01(8). The statute does not define what sort of disorders would fit this definition, although mental retardation is explicitly excluded. Id. The statute requires "experts chosen by the executive director" to evaluate whether the individual meets the requirements of the statute. N.D.C.C. § 25-03.3-12.
[¶ 40] In this case, three psychologists evaluated G.R.H. No psychologist reported that G.R.H. was a sexual deviant, or that he suffered from any type of paraphilia such as pedophilia or hebephilia (sexual attraction to humans who are pubescent). The only psychological disorder G.R.H. was diagnosed with was antisocial personality disorder. Antisocial personality disorder is not an unusual diagnosis for someone who has been in prison. Approximately 40%-60% of the male prison population are diagnosable with antisocial personality disorder. See Kansas v. Crane, 534 U.S. 407, 412, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002) (citing Moran, The Epidemiology of Antisocial Personality Disorder, 34 Social Psychiatry & Psychiatric Epidemiology 231, 234 (1999)). Dr. Etherington testified during the evidentiary hearing in this case that the number was actually higher. She testified that approximately 60%-75% of incarcerated individuals suffered from antisocial personality disorder.
[¶ 41] According to the DSM-IV manual, the authoritative text on psychological disorders, antisocial personality disorder requires a showing of a "pervasive pattern of disregard for and violation of the rights of others occurring since age 15." See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 706 (rev. 4th ed. 2000) (DSM-IV) (detailing antisocial personality disorder). Sexual deviancy is not a necessary component to a diagnosis of antisocial personality disorder. Three or more of the *600 following seven factors must be met for this diagnosis to be applicable.
1. failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest
2. deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure
3. impulsivity or failure to plan ahead
4. irritability and aggressiveness, as indicated by repeated physical fights or assaults
5. reckless disregard for safety of self or others
6. consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations
7. lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another
Id.
[¶ 42] The disorder has a "chronic course but may become less evident or remit as the individual grows older." Id. at 704. All three psychologists concluded G.R.H. suffered from antisocial personality disorder. Dr. Joseph Belanger's written report concluded that G.R.H. met five out of the seven criteria necessary for a diagnosis of antisocial personality disorder. G.R.H. failed to conform to social norms, was deceitful, impulsive, irritable, and lacked remorse. According to Dr. Belanger's report, G.R.H. did not represent a reckless disregard for the safety of others, nor was he conclusively irresponsible. Not one of the three psychologists diagnosed G.R.H. with a psychological disorder that is focused on sexual predatory conduct.
[¶ 43] It is questionable whether a diagnosis of antisocial personality disorder alone should meet our statutory requirements for commitment of a sexually dangerous individual. Assuming it does meet our statutory definition, the evidence submitted to the district court was insufficient to show G.R.H. was "likely to engage in further acts of sexually predatory conduct" because of the psychological disorder. N.D.C.C. § 25-03.3-01(8). The psychologists' reports and testimony were equivocal about G.R.H.'s potential for committing another sex crime.
[¶ 44] Four psychological tests were used to determine whether G.R.H. would have a likelihood of recidivism. Only one of the four tests indicated a recidivism rate that could logically be denoted as "likely" to re-offend. Within a five-year period, the RRASOR showed a 14% chance of recidivism, the Static-99 showed a 39% chance of recidivism, and within a six-year period, the MnSOST-R showed a 78% chance of recidivism. A PCL-R test was also done on G.R.H. Dr. Etherington reported that G.R.H.'s score on the PCL-R test was "not clearly indicative" of a finding that G.R.H. was high risk for sexual recidivism. Her report stated that "such a finding would seem to require, based on existing research, the combination of this PCL-R score range with some type of relevant deviant sexual interest. Such a condition was not diagnosed for [G.R.H.]."
[¶ 45] The testimony presented at trial was also equivocal about G.R.H.'s potential to engage in further acts of sexually predatory conduct. Dr. Robert Gulkin, G.R.H.'s independent expert, testified that G.R.H.'s conduct was opportunistic and impulsive rather than predatory:
Q. [I]n your mind, the idea of what's predatory conduct versus opportunistic conduct, how would you characterize Mr. H.'s previous offenses?
A. In my report, I had made reference to the fact that his two offenses did not present in the predatory manner of some sex offenders, that it  *601 they  it was more opportunistic, that he did in fact take advantage of a situation and the individuals, used some poor judgment. I think this is the impulsivity. [T]his is some of the characterological issues of the Personality Disorder, but I did not see anything suggestive of a paraphilia or an identifiable sexual pathology, and he as such presented qualitatively differently. Impulsive, poor judgment, involving some sexual activity, but not a predatory sexual act.
[¶ 46] Dr. Gulkin also testified that there was only a hypothetical probability or a potentiality that G.R.H. would repeat his behavior.
Q. Okay. In regard I guess to the other diagnosis, the Antisocial Personality Disorder, you did diagnose Mr. H. from suffering from that diagnosis; correct?
A. Yes, I did.
Q. Okay. And you believe that as a result of that diagnosis that that might potentially lead to  potentially lead to sexual misbehavior in the future, that  or would that be a fair statement?
A. Potentially, yes, it may.
Q. Potentially it may, okay. How likely it would lead to that, you don't know quantitatively; correct?
A. That's correct.
[¶ 47] Based on the evidence and testimony presented at the evidentiary hearing, the court's finding that G.R.H. was likely to engage in further acts of sexually predatory conduct because of a diagnosis of antisocial personality disorder was clearly erroneous. While there may have been a showing that G.R.H. potentially or possibly could re-offend, there was not a showing by clear and convincing evidence that G.R.H. was "likely" to engage in sexually predatory conduct. Therefore, the court's finding was clearly erroneous.

III
[¶ 48] While our statute requires an individual to be "likely to engage in further acts of sexually predatory conduct" because of a psychological disorder, the constitution requires something more. The United States Supreme Court has recognized that the inability to control behavior is a necessary constitutional requirement for civil commitment of sexual predators. In order for a civil commitment to be constitutional, there must be a finding of a "serious difficulty in controlling behavior." Kansas v. Crane, 534 U.S. 407, 413, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002); see also Foucha v. Louisiana, 504 U.S. 71, 82-83, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (refusing to allow civil commitment that would permit the indefinite confinement "of any convicted criminal" after completion of a prison term). As the Crane court stated:
the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case.
Crane, 534 U.S. at 413, 122 S.Ct. 867.
[¶ 49] The court recognized the constitutional importance of distinguishing a dangerous sexual offender subject to civil commitment "from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." Crane, 534 U.S. at 412, 122 S.Ct. 867 (citing Kansas v. Hendricks, 521 U.S. 346, 360, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997)). This separation *602 was constitutionally necessary, otherwise "civil commitment" could quickly become a "`mechanism for retribution or general deterrence'  functions properly those of criminal law, not civil commitment." Crane, 534 U.S. at 412, 122 S.Ct. 867 (citing Hendricks, 521 U.S. at 372-73, 117 S.Ct. 2072 (Kennedy, J., concurring)).
[¶ 50] Other jurisdictions interpreting Crane have concluded antisocial behavior is insufficient to civilly commit an individual. According to one jurisdiction, "under United States Supreme Court case law, a state cannot constitutionally confine a person based solely on antisocial behavior. In order to civilly commit an individual, there must be at least clear and convincing evidence that the individual is `mentally ill' and `dangerous.'" In re Doe, 102 Hawai'i 528, 78 P.3d 341, 361-62 (App.2003).
[¶ 51] The record does not support a finding that G.R.H. is a dangerous individual. Although a finding of dangerousness is not alone a sufficient predicate for a civil commitment, Foucha v. Louisiana, 504 U.S. 71, 77, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992), dangerousness is a necessary predicate to a civil commitment. The necessary evidence must show the individual is a danger to public health and safety because the person is likely to engage in sexually violent conduct in the future if not incapacitated. Hendricks, 521 U.S. at 357, 117 S.Ct. 2072.
[¶ 52] The district court erroneously found G.R.H. has a serious difficulty controlling his behavior. This finding was erroneous because there was substantial evidence G.R.H. could control his behavior. A diagnosis of antisocial personality disorder does not preclude such a legal determination that a person can control his behavior.
[¶ 53] Dr. Gulkin recognized a diagnosis of antisocial personality disorder does not mean an individual has a serious lack of ability to control behavior.
The general understanding is that antisocial individuals have the controls. In fact the literature, both research and general clinical literature, is full of observational and other studies that show that antisocial individuals are actively making choices and do control their behavior in different environments doing it differentially based upon the situation.
So it's not the lack of capacity. It's how antisocial individuals view situations and how they make the decisions about proceeding.
[¶ 54] At the initial commitment hearing on September 23, 2004, Dr. Rosalie Etherington testified G.R.H. could control his behavior.
Q. Okay. Would it be fair to say that Antisocial Personality Disorder then are people who can control their actions, but just have a proclivity not to, that they just don't for whatever reason. They can control their actions, but they don't.
A. There's been lots of arguments made about volitional control and does it  you know, does it exist with an antisocial personality. I would say yes, they do have potential to control their behavior. Absolutely. They choose not to or the drive not to, you know, based on the disorder itself is quite strong, but nevertheless, yes. Under controlled circumstances, you know, with enough wherewithal or desire to do so, I do believe they can control themselves.
[¶ 55] Dr. Gulkin concurred in Dr. Etherington's diagnosis.
Q. Dr. Gulkin, would you agree that G.[R.H.] does not have a special and serious lack of ability to control his *603 behavior which would be different from a typical career recidivist?
A. That is correct.
[¶ 56] However, at the second evidentiary hearing, Dr. Etherington testified G.R.H. "suffers from antisocial personality disorder and that disorder in and of itself impairs his volition." Equivocal testimony about G.R.H.'s ability to control behavior does not meet the clear and convincing evidentiary burden under our statute or the constitutional requirement of "serious difficulty in controlling behavior" announced in Crane, 534 U.S. at 413, 122 S.Ct. 867.
[¶ 57] G.R.H.'s ability to control his behavior is further demonstrated by his behavior in prison. Dr. Belanger testified G.R.H.'s conduct had improved while in prison and he "has not had an aggressive physical fight to the best of our knowledge since 1996. He's learning I think to respond to the cues of what will get him into trouble with administration a little bit more quickly." Dr. Gulkin testified "it's my impression that the aggressive and impulsivity that had marked his earlier behavior had diminished, that through aging, education, treatment, it appears that he has been able to moderate those behaviors and demonstrate better control." Dr. Etherington testified G.R.H. "became more compliant with programming. He started in some [college] classes. He completed classes. He just overall did much better."
[¶ 58] G.R.H.'s recent behavior at the State Hospital has been described as "exemplary." John Kildahl, an advanced clinical specialist who spends approximately five hours per week treating G.R.H., described G.R.H. as a model patient.
Q. Okay. During the time that you've been working with Mr. H., tell me a little bit how his behavior has been on the ward. Can you just 
A. I think exemplary.
Q. Okay. When you say exemplary, why would you say that?
A. Because there have been no altercations 
Q. Okay.
A. With others, with other patients, and/or with staff.
Q. Okay.
A. There have been no  in other words, there have been physical incidents with other patients and/or staff.
Q. Okay. Well, would there be any other reasons why you would characterize his behavior as exemplary?
A. I don't know if it's behavior. He helps out  he certainly helps with his groups to help and be insightful, and to give comments to others that he thinks are pertinent to themselves, to himself.
Q. Um-hmm. And I guess in regard to his relationship with other members of the group, is he generally liked by other members of the group, and do they generally have a fairly good working relationship?
A. I think he's liked by some, and I think he's respected by all.
Q. Okay.
A. I don't think everyone likes him.
Q. Okay.
A. I think some are envious.
Q. Okay. In the time that you've been working with him, has he failed to conform with any of the rules or regulations on the ward to any significant degree?
A. No.
Q. Has he been in any way deceitful with you or other members of the treatment staff?

*604 A. Not to my knowledge, no.
Q. Okay. Has he been impulsively, basically in any way, you know, unpredictable, odd behavior, anything along those lines?
A. No.
Q. Okay. Has he been irrational or aggressive?
A. On one occasion.
Q. Okay. Tell us about the one occasion where he was  I believe there was an occasion where he was what, aggressive?
A. I don't [k]now that that's  that's a difficult word, it's a difficult situation, what went on, I think. He was in the situation that I would refer to within one of the core groups that I was leading, and it resulted  it gave him  between he and another patient, basically he confronted another patient on an issue.
Q. Okay.
A. And the other patient grew heated, and there were some threats tossed, and they were returned  it was a heated pretty much face to face argument.
Q. Okay.
A. Of which both parties were at fault.
Q. Okay. How about irresponsible? Has he been responsible in regard to his various obligations? Has he been in any way consistently, or otherwise irresponsible?
A. He's been extremely responsible to his treatment.
Q. Okay. And I guess in his treatment, has he shown any remorse for his actions, his previous actions?
A. Yes, he has.
[¶ 59] G.R.H. can control his behavior. This is demonstrated by his conduct at the State Penitentiary and the State Hospital. There is nothing in the record that would separate G.R.H. from the typical criminal recidivist. As such, he has been properly dealt with in criminal proceedings. Crane, 534 U.S. at 412, 122 S.Ct. 867. He has served his sentence and has already gone through two sex offender treatment programs while at the State Penitentiary. Under an evidentiary standard that requires clear and convincing evidence, the record does not support the court's finding that G.R.H. had a serious difficulty in controlling his behavior. The finding was clearly erroneous.

IV
[¶ 60] The disposition of the trial court, and the majority's interpretation of the statute, places the judicial discretion to determine who should be civilly committed into the hands of a few psychologists, merely applying the DSM-IV manual. This interpretation inevitably leads to a result that usurps the role that is at the cornerstone of the judiciary.
[¶ 61] As the Crane court noted, the "science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law." Crane, 534 U.S. at 413-14, 122 S.Ct. 867 (citing Ake v. Oklahoma, 470 U.S. 68, 81, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (psychiatry not "an exact science"); DSM-IV xxx ("concept of mental disorder ... lacks a consistent operational definition"); id., at xxxii-xxxiii (noting the "imperfect fit between the questions of ultimate concern to the law and the information contained in [the DSM's] clinical diagnosis")).
[¶ 62] In this case, we are aided by an amicus brief from the North Dakota Attorney General's Office. A recent psychological report on the effects of Kansas v. Hendricks and Kansas v. Crane on mental *605 health professional's diagnostic techniques was included in an addendum to the brief. See Cynthia C. Mercado, Robert F. Schopp, and Brian H. Bornstein, Evaluating Sex Offenders Under Sexually Violent Predator Laws: How Might Mental Health Professionals Conceptualize the Notion of Volitional Impairment? 10 Aggression and Violent Behavior 289-309 (2005). The report emphasizes that a clinical diagnosis is not synonymous with meeting a legal standard for civil commitment. Id. at 295. As the expert researchers report:
The use of diagnostic labels for legal purposes has been criticized on the grounds that they are descriptively imprecise. Although potentially helpful in determining whether a pattern of behavior meets a legal threshold, diagnostic labels should not be considered dispositive of a legal issue.
Id. (citations omitted).
[¶ 63] Clinicians have a responsibility to limit their testimony to areas of their competencies. Id. at 296. This is not to say there is no role for mental health professionals. As the psychologists' report notes, "there is utility to clinical expertise when it provides [] description of clinicians' unique understanding of human behavior." Id. But ultimately the court is to make the "normative judgment as to whether such impairment ... renders the individual eligible (or ineligible) for a particular legal status." Id.
[¶ 64] The psychologists reported that G.R.H. suffers from a personality disorder and that disorder impairs his volition. The court concluded that because the psychologists testified that G.R.H. met the legal standard, the court "really has no alternative but to commit him." If we are to accept this interpretation, psychologists will have usurped the judiciary's function. The court must decide whether it has received clear and convincing evidence that G.R.H. has a disorder which makes him a danger to society as a sexually dangerous individual. While clinical expertise is useful in these cases, the court must always maintain its normative role in passing judgment.

V
[¶ 65] Our civil commitment treatment program is appropriate and useful for sexually dangerous individuals who have committed sexually predatory conduct and who have a serious inability to control behavior. But civil commitment requires a clear and convincing showing that the statutory and constitutional requirements are met. It is a heavy burden not met in this case. While our statute may use the phrase "likely to engage in," our judges must read that language in light of the constitutional requirements announced in Crane. If G.R.H. is a candidate for civil commitment, our statute is constitutionally infirm. Because I am firmly convinced the court's decision is not supported by clear and convincing evidence, I would reverse. I, therefore, respectfully dissent.
[¶ 66] GERALD W. VANDE WALLE, C.J., and CAROL RONNING KAPSNER, J., concur.
NOTES
[1] The 2005 Legislative assembly enacted N.D.C.C. § 12.1-20-01(3), which limits criminality based on age for most sex crimes: "When criminality depends on the victim being a minor, the actor is guilty of an offense only if the actor is at least four years older than the minor." The age limitation was not included with the corresponding civil commitment statute.