Filed 2/8/11 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2011 ND 21

In the Matter of G.R.H.

Rozanna C. Larson, 

Ward County State’s Attorney, Petitioner and Appellee

v.

G.R.H., Respondent and Appellant

No. 20100114

Appeal from the District Court of Ward County, Northwest Judicial District, the Honorable Douglas L. Mattson, Judge.

AFFIRMED.

Opinion of the Court by Sandstrom, Justice.

Kelly Ann Dillon, Assistant State’s Attorney, Courthouse, P.O. Box 5005, Minot, N.D. 58702-5005, for petitioner and appellee; submitted on brief.

Ryan D. Sandberg, 2525 Elk Drive, P.O. Box 1000, Minot, N.D. 58702-1000, for respondent and appellant; submitted on brief.

Matter of G.R.H.

No. 20100114

Sandstrom, Justice.

[¶1] G.R.H. appeals a district court order denying his petition for discharge from commitment as a sexually dangerous individual.  We affirm.

 

I

[¶2] G.R.H. was civilly committed as a sexually dangerous individual in 2004, and we affirmed the district court’s commitment order.  
Matter of G.R.H.
, 2006 ND 56, ¶ 3, 711 N.W.2d 587.  He requested a discharge hearing in 2005 while this Court was reviewing his initial commitment, but no action was taken on that request pending our decision in the initial matter.  In 2006, his next request for discharge was heard and denied by the district court, which found he remained a sexually dangerous individual.  G.R.H. requested a third discharge hearing in 2007, and the district court again found by clear and convincing evidence that G.R.H. remained a sexually dangerous individual and denied his petition.  We affirmed the district court’s decision.  
Matter of G.R.H.
, 2008 ND 222, 758 N.W.2d 719.

[¶3] G.R.H. applied for his most recent discharge hearing in April 2009.  The evidence at the hearing centered on the testimony and reports of two expert witnesses.  The first expert, Lynne Sullivan, Ph.D., testified on behalf of the State.  She concluded G.R.H. should remain committed because he meets all three requirements in the classification of a sexually dangerous individual under N.D.C.C. § 25-03.3-

01(8).  Dr. Sullivan testified she believed G.R.H. met the first requirement, that he previously engaged in sexually predatory conduct, on the basis of his past convictions and other admissions regarding sexual activity with teenage girls.  Dr. Sullivan also believed G.R.H. met the second requirement, that he has an acquired or congenital condition manifested by a sexual disorder, because of recurrent, intense sexual thoughts, his arousal by girls going through puberty, and his anti-social personality disorder.  Finally, she testified G.R.H. met the third requirement, that he is likely to engage in further sexually predatory conduct, in part because of the findings already mentioned and because of the results of certain risk assessment tools showing G.R.H. is prone to recidivism.

[¶4] Dr. Sullivan also relied in part on some of G.R.H.’s admissions in treatment.  In order to progress to the next level of treatment, G.R.H. was required to take a polygraph examination, which he failed.  Following this examination, G.R.H. made admissions that were previously unknown to his caretakers.  G.R.H. admitted that, against treatment rules, he had engaged in sex with his girlfriend during visitation and used a credit card for phone sex.  G.R.H. also admitted to sexual activity with twelve teenage girls.  He was demoted to a lower treatment level on the basis of these admissions, which Dr. Sullivan later used in her assessment.

[¶5] Robert Riedel, Ph.D., served as G.R.H.’s independent expert evaluator and agreed with Dr. Sullivan’s conclusions on the first two requirements in the classification of a sexually dangerous individual under N.D.C.C. § 25-03.3-01(8).  He testified the first requirement was met because G.R.H. has a proven history of sexually predatory conduct.  Dr. Riedel also agreed on the second requirement, though he noted G.R.H.’s primary arousal is to adult females, and in the past he “reverted to teenagers because of availability of teenagers and the lack of availability of adult females.”

[¶6] Dr. Riedel disagreed with Dr. Sullivan’s conclusions on the third requirement, partly because of the risk assessment tests, some of which he declared were “way out of date” and not good predictors of future sexual misconduct.  He also noted G.R.H.’s “steady progress” in treatment, his family support system, and his plans for release all lowered his chance of recidivism.  On the basis of these findings, Dr. Riedel concluded G.R.H. does not meet the statutory requirements for continued commitment.

[¶7] G.R.H. argued his rights against self-incrimination were violated by using his admissions made in treatment against him, because the proceedings were impermissibly punitive in nature.  The district court disagreed and denied his petition for discharge.  The court found G.R.H. did not prove by clear and convincing evidence the proceedings were so punitive as to be rendered criminal.  It noted treatment normally involves advancements and setbacks, and honesty in treatment is required for an individual to advance to completion.  Recognizing that the experts agreed G.R.H. met the first two requirements for classification as a sexually dangerous individual, the court concluded the evidence showed G.R.H. met the third requirement as well.  It concluded G.R.H. is likely to engage in further sexually predatory conduct and has a “significant” problem controlling his behavior.

[¶8] On appeal, G.R.H. argues the district court should not have considered his admissions in treatment, because they violated his rights against self-incrimination and are being used to punish him.  He also argues there was not clear and convincing evidence he would engage in further acts of sexually predatory conduct.  Finally, he contends the district court failed to find he has serious difficulty controlling his behavior, and therefore it could not conclude he is a sexually dangerous individual under N.D.C.C. § 25-03.3-01(8).

[¶9] The district court had jurisdiction of the discharge hearing under N.D. Const. art. VI, § 8, and N.D.C.C. § 25-03.3-02.  G.R.H.’s appeal was timely under N.D.C.C. § 25-03.3-19.  This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 25-03.3-19.

 

II

[¶10] We apply a modified clearly erroneous standard in reviewing commitments of sexually dangerous individuals.  
Interest of Maedche
, 2010 ND 171, ¶ 9, 788 N.W.2d 331.  “We will affirm a district court’s commitment order unless the order is induced by an erroneous view of the law, or we are firmly convinced the order is not supported by clear and convincing evidence.”  
Id.

[¶11] For the purposes of involuntary civil commitment, N.D.C.C. § 25-03.3-01(8) defines a sexually dangerous individual as:

[A]n individual who is shown to have engaged in sexually predatory conduct and who has a congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction that makes that individual likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others. . . .

The United States Supreme Court has held that civil commitment of a sexually dangerous individual cannot be sustained without finding that the individual has serious difficulty controlling his or her behavior.  
Kansas v. Crane
, 534 U.S. 407, 413 (2002).  The United States Supreme Court stated this “distinction is necessary lest civil commitment become a mechanism for retribution or general deterrence—functions properly those of criminal law, not civil commitment.”  
Id.
 at 412 (quotations omitted).  We have construed the definition of a sexually dangerous individual to require a nexus between the disorder and dangerousness, which distinguishes such an individual from other dangerous persons.  
Matter of Hanenberg
, 2010 ND 8, ¶ 8, 777 N.W.2d 62.  The district court is the best evaluator of conflicting testimony, and it is not the function of this Court to second-guess its conclusions as to which is more credible.  
Matter of M.D.
, 2008 ND 208, ¶ 7, 757 N.W.2d 559.

 

A

[¶12] G.R.H. first argues his admissions during treatment should not have been considered by the district court in denying his petition.  These admissions were used by the court in concluding G.R.H. met the third requirement, that he is likely to engage in further acts of sexually predatory conduct that constitute a danger to others.  G.R.H. contends N.D.C.C. ch. 25-03.3 is impermissibly punitive in nature because it subjects him to indefinite confinement motivated by retribution and deterrence.  He also notes he may be charged criminally under N.D.C.C. ch. 12.1-20 for behavior that may trigger commitment under N.D.C.C. ch. 25-03.3.  He argues that allowing a court to consider his statements made in treatment creates an unavoidable dilemma:  If he answers questions truthfully, his responses may form the basis for further confinement.  If he is uncooperative in answering, his failure to answer can also form the basis for further confinement.

[¶13] G.R.H.’s argument asks us to consider the purpose and effect of N.D.C.C. ch. 25-03.3.  Statutory interpretation is a question of law, fully reviewable on appeal.  
VND, LLC v. Leevers Foods, Inc.
, 2003 ND 198, ¶ 9, 672 N.W.2d 445.  Words used in a statute are given their ordinary and commonly understood meaning unless a contrary intention plainly appears.  N.D.C.C. § 1-02-02.  Statutes are construed as a whole and are harmonized with related provisions.  N.D.C.C. § 1-02-07.  When the language of a statute is unambiguous, “the letter of [the statute] is not to be disregarded under the pretext of pursuing its spirit.”  N.D.C.C. § 1-02-05.  We also consider the context of the statutes and the purposes for their enactment.  
Falcon v. State
, 1997 ND 200, ¶ 9, 570 N.W.2d 719.

[¶14] Chapter 25-03.3, N.D.C.C., is expressly intended to be civil in nature.  
See, e.g.
, N.D.C.C. § 25-03.3-03.1 (“[A] recommendation is to be made to a state’s attorney for civil commitment of the inmate under this chapter.”).  We inquire further, however, to assure that a statutory scheme intended to be civil in nature is not so punitive in purpose or effect as to be transformed into a criminal penalty.  
State v. Kelly
, 2001 ND 135, ¶ 16, 631 N.W.2d 167.  In 
Kelly
 we noted that the factors in 
Kennedy v. Mendoza-Martinez
, 372 U.S. 144 (1963), provide useful indicators in evaluating whether a civil penalty is effectively punitive in application:

(1) the sanction involves an affirmative disability or restraint; (2) it has historically been regarded as a punishment; (3) it comes into play only on a finding of 
scienter
; (4) its operation will promote the traditional aims of punishment—retribution and deterrence; (5) the behavior to which it applies is already a crime; (6) an alternative purpose to which it may rationally be connected is assignable for it; and (7) it appears excessive in relation to the alternative purpose assigned.

Kelly
, at ¶ 16.  By “the clearest proof” the challenger must show the commitment statute is so punitive in form and effect as to render it criminal despite the legislation’s intent to the contrary.  
In re M.D.
, 1999 ND 160, ¶ 26, 598 N.W.2d 799 (
see also
 
United States v. Ursery
, 518 U.S. 267, 290 (1996)).

[¶15] We are guided by the United States Supreme Court’s decision in 
Kansas v. Hendricks
, 521 U.S. 346 (1997), in deciding whether N.D.C.C. ch. 25-03.3 is impermissibly punitive.  The United States Supreme Court stated in 
Hendricks
 that involuntary commitment statutes will be upheld if they are subject to proper procedures and evidentiary standards.  
Id.
 at 357.  “It thus cannot be said that the involuntary civil confinement of a limited subclass of dangerous persons is contrary to our understanding of ordered liberty.”  
Id.
  If the State seeks to commit an individual under N.D.C.C. ch. 25-03.3, it must do so within a rigid evidentiary and procedural framework.  The State must initially show probable cause for a commitment hearing to take place.  N.D.C.C. § 25-03.3-11.  At the commitment hearing, nothing less than “clear and convincing evidence” may justify the commitment as a sexually dangerous individual.  N.D.C.C. § 25-03.3-13.  The court must provide the individual with an independent expert evaluator to participate on the respondent’s behalf.  N.D.C.C. § 25-03.3-12.  A committed individual has a right to petition for discharge annually, which requires the State to again prove by clear and convincing evidence that the individual remains sexually dangerous.  N.D.C.C. § 25-

03.3-18.  These statutes reflect a proper emphasis on rigid procedures and evidentiary standards as required by 
Hendricks
 to guard against impermissible civil commitments.

[¶16] North Dakota’s statutory scheme closely resembles the statute upheld in 
Hendricks
.  In 
Hendricks
, the United States Supreme Court upheld the Kansas statute, stating it was “plainly of a kind with . . . other civil commitment statutes:  It requires a finding of future dangerousness, and then links that finding to the existence of a ‘mental abnormality’ or ‘personality disorder’ that makes it difficult, if not impossible, for the person to control his dangerous behavior.”  
Hendricks
, 521 U.S. at 358.  North Dakota’s commitment framework contains this exact requirement endorsed by the United States Supreme Court.  Section 25-03.3-01(8), N.D.C.C., requires the individual’s condition be manifested by a “sexual disorder, a personality disorder, or other mental disorder or dysfunction.”  By requiring this connection between the dangerous condition and a mental disorder, N.D.C.C. ch. 25-03.3 narrows the class of affected individuals to those with impairments rendering them dangerous beyond their control.

[¶17] Chapter 25-03.3, N.D.C.C., conforms to all the requirements of 
Hendricks
.  It contains procedural and evidentiary safeguards for affected individuals.  Also required is a specific finding of a mental disorder, limiting its effect to a narrow class of individuals.  The fifth 
Kennedy
 factor weighs against N.D.C.C. ch. 25-03.3 in that some behavior may trigger both criminal liability and civil commitment.  This overlap is narrow, however, and civil commitment in these circumstances is justified by a significant public safety interest.  “[T]he mere fact that a person is detained does not inexorably lead to the conclusion that the government has imposed punishment.”  
U.S. v. Salerno
, 481 U.S. 739, 746 (1987).  The civil commitment provisions of N.D.C.C. ch. 25-03.3 are not impermissibly punitive in form or effect.

[¶18] Because N.D.C.C. ch. 25-03.3 operates properly as a civil commitment framework, G.R.H.’s argument that his right against self-incrimination was violated is without merit.  
See
 U.S. Const. amend. V.  Chapter 25-03.3, N.D.C.C., serves a dual purpose, protecting the public from the most dangerous sexual offenders while simultaneously treating those individuals so they may safely return to the community.  
Interest of P.F.
, 2008 ND 37, ¶ 20, 744 N.W.2d 724 (citing 
Hearing on H.B. 1047 Before the Senate Judiciary Comm.
, 55th N.D. Legis. Sess. (March 5, 1997) (testimony of Attorney General Heidi Heitkamp)).  The district court’s consideration of G.R.H.’s admissions served these dual aims.  The court must consider all information regarding G.R.H.’s condition if the public is to be protected and G.R.H. is to receive the most effective treatment.  G.R.H.’s treatment can be successful only if he is open and honest, and the public is not adequately protected if G.R.H. is released from treatment prior to his successful completion.

 

B

[¶19] G.R.H. argues the district court erred in concluding there was clear and convincing evidence that he is likely to engage in further acts of sexually predatory conduct, the third requirement in the sexually dangerous individual test under N.D.C.C. § 25-03.3-01(8).  G.R.H. contends the court’s finding was clearly erroneous because it considered his admissions in treatment and also the results of certain psychological assessments used by Dr. Riedel and Dr. Sullivan.

[¶20] Unlike the previous issue, this argument does not focus on the general effect of N.D.C.C. ch. 25-03.3.  Instead, it focuses on the decision to commit G.R.H. under the existing statutes.  G.R.H.’s civil commitment under N.D.C.C. ch. 25-03.3 is reviewed under a modified clearly erroneous standard of review.  
See
 
Maedche
, 2010 ND 171, ¶ 9, 788 N.W.2d 331.

[¶21] “[T]he phrase ‘likely to engage in further acts of sexually predatory conduct’ means the individual’s propensity towards sexual violence is of such a degree as to pose a threat to others.”  
In re R.A.S.
, 2009 ND 101, ¶ 6, 766 N.W.2d 712 (quotation omitted).  The State was required to prove by clear and convincing evidence that G.R.H. had this propensity.  N.D.C.C. § 25-03.3-13.  In concluding the State met its burden, the district court noted it was relying on the psychological assessments and the testimony of Dr. Riedel and Dr. Sullivan.

[¶22] The district court’s order reflects an appropriate consideration of the psychological assessments.  Dr. Riedel testified he believed one of the tests employed, the Minnesota Sex Offender Screening Score Revised (“MnSOST-R”), was out-of-date and not being used in a way that was scientifically proper.  Dr. Sullivan testified that while parts of the MnSOST-R may be out-of-date, other uses of the test “are still considered to be relevant and appropriate.”  The district court nevertheless found the MnSOST-R overestimated the risk of recidivism and concluded it should not be considered.

[¶23] The court considered the results of the Static-99-R test, however, which both Dr. Riedel and Dr. Sullivan used to classify G.R.H. as a “high risk” individual.  Both doctors testified about their use and continued reliance on this instrument.  The court considered the results of the Static-99-R, which both doctors testified was reliable, and disregarded the results of the MnSOST-R test that had questionable predictive value.  This consideration of the psychological assessments shows proper care and caution, and was not clearly erroneous.

[¶24] The court’s consideration of the doctors’ testimony was also reasonable.  It was proper for the doctors to consider G.R.H.’s admissions in treatment, and they also had a wealth of other information on which to form their opinions.  Dr. Sullivan and Dr. Riedel both personally interviewed G.R.H.  They had access to his performance records in treatment.  They had the ability to consider his sexual history.  They had the ability to review his past scores on the various assessment tests.  Dr. Riedel and Dr. Sullivan had access to a significant amount and variety of information on which they could evaluate G.R.H., and their opinions could reasonably be relied upon.

[¶25] The court’s consideration of the experts’ testimony in conjunction with all of the other evidence presented is the type of inquiry required by N.D.C.C. §§ 25-03.3-

13 and 25-03.3-18(4).  The district court’s finding that G.R.H. is likely to engage in further acts of sexually predatory conduct was not clearly erroneous.

 

C

[¶26] G.R.H. argues the district court could not have found he remains a sexually dangerous individual, because it did not find he had serious difficulty controlling his behavior.

[¶27] The district court is required to find that an individual to be committed has a serious problem controlling his behavior.  
Matter of Hehn
, 2008 ND 36, ¶ 19, 745 N.W.2d 631.  G.R.H.’s argument stems from the district court’s order stating, “The Court also finds that the evidence shows G.R.H. has a 
significant
 problem controlling his behavior . . . .”  (Emphasis added.)  Despite the court’s use of the word “significant” in its ultimate conclusion, its analysis makes it clear the court employed the correct test.  Earlier in its order the court quoted the 
Crane
 standard in noting the State had to prove G.R.H. had “serious difficulty controlling his behavior” to establish the third requirement of the sexually dangerous individual test.  
See
 
Crane
, 534 U.S. at 413.  The court then analyzed in detail the third requirement before ultimately concluding G.R.H. remained a sexually dangerous individual.  The district court properly found G.R.H. had serious difficulty controlling his behavior.

 

III

[¶28] North Dakota’s civil commitment framework for sexually dangerous individuals, N.D.C.C. ch. 25-03.3, is not impermissibly punitive in nature.  G.R.H.’s right against self-incrimination was not violated, and the district court’s findings were not clearly erroneous.  We affirm the district court order denying G.R.H.’s petition for discharge.

[¶29] Dale V. Sandstrom

Daniel J. Crothers

Mary Muehlen Maring

Gerald W. VandeWalle, C.J.

Kapsner, Justice, dissenting.

[¶30] I respectfully dissent.

[¶31] G.R.H. engaged in criminal activity for which he was prosecuted and punished.  Since 2004, however, he has been deprived of his liberty, not on the basis of some predatory act, but on the basis of a prediction that, if allowed to be free, he will engage in sexually predatory activity.  His case is a study in how fragile the evidence is on which such a prediction has been made and continues to be made.  I dissent because I do not believe that the evidence establishes by clear and convincing evidence that G.R.H. will engage in further acts of sexually predatory conduct which constitute a danger to others or that G.R.H. has serious difficulty controlling his behavior.

[¶32] In 2004, when G.R.H. was first committed, the State’s witness, Dr. Rosalie Etherington, testified that G.R.H. at that time had not been diagnosed with any sexual deviancy.  Instead, the State relied on his antisocial personality disorder, coupled with actuarial test instruments and the PCL-R to predict that G.R.H. would reoffend.  The State introduced and relied upon the RRASOR, the STATIC-99, and the MnSOST-R.  As the evidence presented at the current discharge hearing shows, the reliability of the evidence on which G.R.H. has been deprived of his liberty for over six years now is suspect; it does not carry the weight of clear and convincing evidence.  Nevertheless, despite a record replete with information that in 2004, during his stay in prison and during his evaluation at the state hospital, G.R.H. had been able to control his behavior, he was committed.  
Matter of G.R.H.
, 2006 ND 56, 711 N.W.2d 587.

[¶33] In 2007, G.R.H. petitioned for discharge and a hearing was held in 2008.  The State’s witness testifying in favor of continuing commitment was Dr. Lincoln Coombs.  He testified that G.R.H. had progressed well in treatment and achieved Stage 4 of treatment.  He testified that in 2006 Dr. Lynne Sullivan had recommended that G.R.H. have alternative treatment from his confinement in the secure ward at the state hospital, but that none was available for him at that time.  He testified that in order for G.R.H. to advance in his treatment, G.R.H. was mandated to take a polygraph test, a new requirement in the treatment regime, which required honest disclosure of his sexual history.  In preparation for and during that polygraph test, G.R.H. disclosed several previously unknown sexual contacts with teenage girls, ages thirteen to seventeen, occurring while G.R.H. was aged nineteen to twenty-seven.  I have previously discussed the legal implication of compelled disclosure and the implication of the use of such forced disclosure for commitment purposes, and I do not repeat it here.  
Matter of G.R.H.
, 2008 ND 222, ¶¶ 23-26, 758 N.W.2d 719.

[¶34] As a result of these compelled disclosures, G.R.H. has been diagnosed with paraphilia NOS (hebephilia).  Dr. Coombs testified that while it is “not uncommon for adult men to be sexually attracted to teen girls,” the fact that G.R.H. “actually acted on it nine additional times after he was consequenced, knowing what the consequences would be.  That’s representative of a disorder.”  All of the new disclosed sexual activity occurred prior to the treatment commencing in 2004, during which treatment G.R.H. had made substantial progress, according to the testimony of Dr. Coombs.  Dr. Coombs also testified that G.R.H. has “a good cognitive understanding of his sex offense cycle.”  His then current treatment notes did not indicate an interest in adolescent sexual activities.  
G.R.H.
, 2008 ND 222, ¶ 9, 758 N.W.2d 719.  The main predictive evidence relied upon by the court in 2008 was again the RRASOR, the Static-99, the MnSOST-R., telephone calls to “sex lines,” and sexual contact with his girlfriend during visits.  
Id.
 at ¶¶ 4, 9.  The latter two were problematic because they were violations of the rules of the institution.  
Id.
 at ¶ 9.

[¶35] During the hearing on G.R.H.’s current petition for discharge, the State’s witness was Dr. Lynne Sullivan.  Her report to the court included risk assessment instruments, but her testimony called into question the validity of those instruments.  With respect to the MnSOST-R, which has been introduced at every hearing relative to G.R.H.’s commitment, she testified:

Q And in your opinion are those still valid scores?

A Yes.  I do believe the scores are likely valid.  There has been new information about the MnSOST-R that indicates that the percentage risk estimate of sexual recidivism is no longer valid.  They are probably an over-estimate.  But the absolute score and the categorical classification associated with those scores are still considered to be relevant and appropriate.

[¶36] Regarding the RRASOR introduced at the two prior hearings, she testified:

A I did look at the score on the RRASOR, the Rapid Risk Assessment of Sexual Offense Recidivism.  However, at the conference, the [American Association for the Treatment of Sexual Abusers] conference in October of this year, the authors of that instrument said that instrument is no longer to be used.  That it is no longer valid.  Therefore, I wouldn’t consider that in this particular case.

[¶37] Referencing the Static-99 introduced at the two prior hearings, Dr. Sullivan stated:

A The creators of the RRASOR and the Static-99 have stated unequivocally that the RRASOR is not to be used and the Static-

99R with the new associated norms is to be used.

[¶38] Dr. Sullivan acknowledged that the MnSOST-R, which is repeated in her report, even if its statistical reliability were not currently questioned, would not provide information that is currently useful:

A According to the North Dakota Manual for the Scoring of the MnSOST-R, the dynamic variables have to be, can only be used while incarcerated in prison.  There are special rules if a person is released directly to probation.  But, the bottom line is they cannot be used for progress or changes that have been made while institutionalized as a sexually dangerous individual.

Q Let me get this straight, then.  So, no matter what he does in treatment he can’t lower the MnSOST score, then?

A That’s right.

Q So, basically, no matter what he does he will always be referred for commitment according to the MnSOST-R?

A Yes.

Q So, 20 years from now you could look at the MnSOST-R and say, well he should be referred for commitment?

A If that were the only thing someone was looking at, yes.

Q Also, on the MnSOST-R you have in there 78 percent at six years recidivism rate, is that correct?

A That’s right.  Yes.

Q Do you still put that number in your new evaluations, new reports that you do?

A No, I don’t.

Q What do you put in there instead?

A I put in there that the author of the instrument has advised that these risk estimates are likely to be over-estimates of a person’s risk for re-offense.  Therefore, they should not be used.

Q So, then, should we tell the Judge when he sees 78 percent in his report, cross it out?

A He can certainly do that, yes.

Q Because that 78 percent is an over-estimate?

A It’s believed to be, yes.

Q So, is it safe to say that these tests actually have errors, they have some problems with it, is that correct?

A Yes.

Q And this is a rather new area of, I guess, of psychology, is that correct, sex offender evaluating?

A New as within the past ten years, yes.

Q So, as each year or decade goes by you get better at it?

A Theoretically, yes.

Q And it appears to me that the old information that you have actually seems to be the rate of recidivism or re-conviction or re-arrest are actually going down.  They are not increasing, are they?

A They haven’t yet increased, you are right.  They have been going down.

Q Because there was problems with the old testing?

A There are a variety of reasons.  Theories about why the rate is decreased.  Nobody knows for sure.

THE COURT:  May I ask a question?  The MnSOST-R, was it originally called the MnSOST test?  Does the R stand for revised?

THE WITNESS:  Yes, it does.

THE COURT:  And, so, when you have the MnSOST-R in your report and 78 percent, what you are telling me or what you have testified to is that you went to a September, October conference and the authors of the MnSOST-R indicated that you shouldn’t be using those type of numerical values because they are based on an over-estimate.  So it’s not only revised but it’s redacted.

THE WITNESS:  Actually, the MnSOST was not discussed at the conference in October.  It’s was the RRASOR and the Static-99.  The information about the MnSOST has come forward by a list server that I am a member of.

[¶39] The trial judge summed up the difficulty with trying to use predictive instruments whose reliability is questioned by the very profession that developed them.

But, I hear the term actuary table or actuary study and I hear that the data is flawed and therefore we can’t use this portion or that portion.  To me that’s kind of giving whole new meaning to the term actuary.  It sounds like we have an area that is trying to use terms of mathematical certainty but yet it doesn’t fit because the data isn’t consistent with that.  I will leave that to you.  But that’s an impression I am getting right now.

[¶40] More than that, actuarial instruments are just that.  By definition, actuarial instruments predict what will happen with large groups of people, but are unable to predict with any certainty at all what one individual within that group will do.  This does not rise to the level of clear and convincing evidence.

[¶41] When asked to identify what behaviors G.R.H. exhibited that led Dr. Sullivan to believe that he had difficulty controlling his behavior, her testimony was as follows:

Based on the most recent information that he has continued to engage in phone sex with individuals despite that this is against the rules of the unit, [G.R.H.] has previously been consequenced for such behavior, knows that it would interfere with his progress in treatment, and yet has persisted in engaging in such behavior, I do believe that that indicates he has a serious difficulty in controlling his behavior.

This information was disclosed in treatment.  “[G.R.H.] came to group and admitted that he had been engaging in phone sex as recently as December [2009].  The ages of the individuals with whom he engaged in phone sex was not known—”  Phone sex is not sexually predatory conduct under N.D.C.C. § 25-03.3-01(9).  It is a violation of the rules of the institution.  So is having consensual sex with an adult member of the opposite sex while visiting.  
G.R.H.
, 2008 ND 222, ¶ 9, 758 N.W.2d 719.  This was the violation of the rules used during the hearing in 2007 to show that G.R.H. could not control his behavior.  It appears that in the name of treatment, especially prolonged isolated treatment where there is no appropriate sexual outlet, violation of rules is considered enough for continued indefinite deprivation of liberty.  This is true even if those rule violations do not demonstrate sexually predatory conduct, grooming for sexually inappropriate behavior, assaultive behavior, or even rudeness.  I do not think such deprivation of liberty should come so cheaply.

[¶42] I dissent because there is no clear and convincing evidence that meets the statutory criteria.

[¶43] Carol Ronning Kapsner